John F. Medler, Jr. (SBN 266474)
THE MEDLER LAW FIRM, APC
john@medlerlawfirm.com
2030 Main Street Suite 1300
Irvine, CA 92614
Telephone: (949)-260-4940
Facsimile: (949)-260-4944

Caleb Marker (SBN 269721)
ZIMMERMAN REED LLP
caleb.marker@zimmreed.com
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
Telephone: (877) 500-8780
Facsimile: (877) 500-8781

*Attorneys for Plaintiffs and the Proposed Class*
*Additional counsel on signature page*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALYSSA TAMBOURA, MARINE HALL-POIRIER, KEITH HALL, LAURENCE POIRIER, YASAMIN GHODSBIN, MIKA TJOA, CANDACE TJOA, TIMMY MAI, CHRISSY PHAM, ESTEBAN FRAUSTO, KARL ARMBRUST, DIRK ARMBRUST, LEILANI DURDEN, LANAE DURDEN, JILLIAN GARCIA, VICTOR GARCIA, LAILA KEYHAN, KASRA KEYHAN, CALEB CRANE, FALEN ROBINSON, COLE SMITH, RONDA SMITH , KATHLEEN TATUSKO, AMY TATUSKO, ANGELIQUE VOLLMER, and MICHAEL VOLLMER, <br><br> individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> WILLIAM "RICK" SINGER, THE KEY WORLDWIDE FOUNDATION, THE EDGE COLLEGE & CAREER NETWORK, LLC, d/b/a "THE KEY," THE UNIVERSITY OF SOUTHERN CALIFORNIA, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, STANFORD UNIVERSITY, THE UNIVERSITY OF TEXAS AT AUSTIN, WAKE FOREST UNIVERSITY, YALE UNIVERSITY, and GEORGETOWN UNIVERSITY, <br><br> Defendants. | Case No. 5:19-cv-03411-EJD <br><br> CLASS ACTION AMENDED COMPLAINT <br><br> DEMAND FOR JURY TRIAL |

**COMPLAINT**

Plaintiffs Alyssa Tamboura, Marine Hall-Poirier, Keith Hall, Laurence Poirier, Yasamin Ghodsbin, Mika Tjoa, Candace Tjoa, Timmy Mai, Chrissy Pham, Esteban Frausto, Karl Armbrust, Dirk Armbrust, Leilani Durden, LaNae Durden, Jillian Garcia, Victor Garcia, Laila Keyhan, Kasra Keyhan, Caleb Crane, Falen Robinson, Cole Smith, Ronda Smith, Kathleen Tatusko, Amy Tatusko, Angelique Vollmer, and Michael Vollmer, individually and on behalf of all others similarly situated, bring this action based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon, *inter alia*, the investigations of their attorneys.

## I.   OVERVIEW

1.      This Class Action Lawsuit involves a fraudulent university-admission scheme coordinated between three distinct groups: (1) parents whose college-age children had insufficient test scores and other credentials to gain admission to highly selective universities, but who nevertheless believed that they could bribe their child's way through the college admissions door; (2) a California resident, William "Rick" Singer, who, through the use of a fraudulent college-admissions-mentoring company and a fraudulent California charitable foundation, saw an opportunity to enrich himself to the tune of millions of dollars through fraud and bribery; and (3) individuals involved in the university admission pipeline who were supposed to keep the college admission process honest (including representatives of at least eight highly selective Universities) who were willing to accept bribes and thereby taint the college admission process.

2.      This Student-Athlete Recruitment scheme involved parents who would pay Singer, his business, or his fraudulent charity huge sums of money; and, in exchange, Singer would create false sports profiles for the parent's teenaged student, making it seem as though the teenager was a superior athlete in a sport.  Then Singer would offer significant, hefty bribes to employees of the universities—typically coaches or managers in the school's athletic department.  Under college admission practices, university admissions programs would set aside a certain number of "slots" for admission of students who excelled in certain sports.  Excelling in sports was a known, objective criterion applied by the universities.  The bribed university officials would then bypass otherwise qualified student candidates

1  and instead insert into those athletic admissions slots applicants did not qualify as persons excelling

2  in sports.

3  3.  As a result of this coordinated, fraudulent scheme, conducted through wire and mail,

4  unqualified students found their way into the admissions rolls of highly selective universities, while

5  those students who played by the rules were denied admission.

6  4.  Meanwhile, each of the universities were negligent in failing to maintain adequate

7  protocols and security measures in place to guarantee the sanctity of the college admissions process,

8  and to ensure that their own employees were not engaged in these type of bribery schemes.

9  5.  Each of the rejected students was damaged by the fraudulent and negligent conduct of

10  the Defendants in that, at a minimum, each Class member paid college admission application fees to

11  the Defendant universities without any understanding or warning that unqualified students were

12  slipping in through the back door of the admissions process by committing fraud, bribery, cheating,

13  and dishonesty.

14  6.  Each of the universities took the students' admission application fees while failing to

15  take adequate steps to ensure that their admissions process was fair and free of fraud, bribery, cheating

16  and dishonesty.  They each promised an application process that was fair and that objectively

17  evaluated all applicants based on the university's common set of application criteria.

18  **II.   PARTIES**

19  7.  Plaintiff Alyssa Tamboura is a resident of Santa Cruz County, California and is a

20  student at the University of California, Santa Cruz.

21  8.  Plaintiff Marine Hall-Poirier is a resident of Monroe County, Florida and is a graduate

22  of the University of Oregon.  At the time of her application, Plaintiff Hall-Poirier was a resident of

23  the state of California.

24  9.  Plaintiff Keith Hall is a resident of Monroe County, Florida and is the parent of

25  Plaintiff Marine Hall-Poirier.  At the time of Plaintiff Hall-Poirier's application, Plaintiff Hall was a

26  resident of the state of California.

27

28

10.     Plaintiff Laurence Poirier is a resident of Monroe County, Florida and is the parent of Plaintiff Marine Hall-Poirier.  At the time of Plaintiff Hall-Poirier's application, Plaintiff Poirier was a resident of the state of California.

11.     Plaintiff Yasamin Ghodsbin is a resident of Los Angeles County, California.

12.     Plaintiff Mika Tjoa is a resident of Orange County, California and is a student at the University of California, Berkeley.

13.     Plaintiff Candace Tjoa is a resident of Orange County, California and is the parent of Mika Tjoa.

14.     Plaintiff Timmy Mai is a resident of Stanislaus County, California and is a student at San Jose State University.

15.     Plaintiff Chrissy Pham is a resident of Stanislaus County, California and is the parent of Plaintiff Timmy Mai.

16.     Plaintiff Esteban Frausto is a resident of San Diego County, California and is a student at the University of California Irvine.

17.     Plaintiff Karl Armbrust is a resident of Falls County, Texas and is a student at the University of Oregon.

18.     Plaintiff Dirk Armbrust is a resident of Falls County, Texas and is the parent of Plaintiff Karl Armbrust.

19.     Plaintiff Leilani Durden is a resident of Santa Clara County, California and is a student at the University of California, Santa Barbara.

20.     Plaintiff LaNae Durden is a resident of Santa Clara County, California and is the parent of Plaintiff Leilani Durden.

21.     Plaintiff Jillian Garcia is a resident of Hays County, Texas and is starting college at the University of North Texas.

22.     Plaintiff Victor Garcia is a resident of Hays County, Texas and is the parent of Plaintiff Jillian Garcia.

23.     Plaintiff Laila Keyhan is a resident of Los Angeles County, California and is a student at the University of California, Los Angeles.

24.     Plaintiff Kasra Keyhan is a resident of Los Angeles County, California and is the parent of Plaintiff Laila Keyhan.

25.     Plaintiff Caleb Crane is a resident of Thurston County, Washington and is a student at the University of Washington Tacoma.

26.     Plaintiff Falen Robinson is a resident of Thurston County, Washington and is the parent of Plaintiff Caleb Crane.

27.     Plaintiff Cole Smith is a resident of Essex, New Jersey and is a student at Steven's Technology Institute.

28.     Plaintiff Ronda Smith is a resident of Essex, New Jersey and is the parent of Plaintiff Cole Smith.

29.     Plaintiff Kathleen Tatusko is a resident of Aiken County, South Carolina and is a student at Clemson University.

30.     Plaintiff Amy Tatusko is a resident of Aiken County, South Carolina and is the parent of Plaintiff Kathleen.

31.     Plaintiff Angelique Vollmer is a resident of Clark County, Nevada and is a student at the University of Nevada Reno.

32.     Plaintiff Michael Vollmer is a resident of Clark County, Nevada and is the parent of Plaintiff Angelique.

33.     Defendant William "Rick" Singer ("Singer") is, upon information and belief, a resident of Newport Beach, California, in Orange County California, but also does business in Sacramento, California.  Singer is a citizen of the State of California.

34.     Defendant The Edge College & Career Network, LLC d/b/a "The Key" ("The Key") is a limited liability corporation with its principal place of business located at 3415 American River Drive, Suite D, Sacramento, CA 95864, in Sacramento, California, and is a resident of Sacramento County, California and a citizen of California.  The Key also does business in Newport Beach, California, in Orange County, California.

35.     Defendant The Key Worldwide Foundation ("KWF") is a purported charitable organization with its principal place of business located at 265 Hartnell Place, Sacramento, CA 95825, and is a resident of Sacramento County, California and a citizen of California.

36.     Defendant University of Southern California ("USC") is a private, highly selective university located in or near Los Angeles County, California and is a resident of Los Angeles County and citizen of California. Persons at the university accepting bribes acted as university representatives, as they were vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing USC to act unlawfully.

37.     Defendant Stanford University ("Stanford") is a private, highly selective university located in or near Palo Alto, California, in Santa Clara County, California, and is a resident of Santa Clara County and citizen of California.  The individual at the university accepting bribes acted as a university representative, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing Stanford to act unlawfully.

38.     Defendant the University of Texas at Austin ("UT-Austin") is a public, highly selective university located in or near Travis County, Texas, and is a resident of Travis County and a citizen of Texas.  The individual at the university accepting bribes acted as a university representative, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing UT-Austin to act unlawfully.

39.     Defendant Wake Forest University is a private, highly selective university located in or near Forsyth County, North Carolina, and is a resident of Forsyth County and a citizen of North Carolina.  The individual at the university accepting bribes acted as a university representative, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing Wake Forest to act unlawfully.

40.     Defendant Yale University is a private, highly selective university located in or near New Haven County, Connecticut, and is a resident of New Haven County and a citizen of Connecticut.  The individual at the university accepting bribes acted as a university representative, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing Yale to act unlawfully.

41.     Defendant Georgetown University is a private, highly selective university located in or near the District of Columbia, and is a resident and citizen of the District of Columbia.   The individual at the university accepting bribes acted as a university representative, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing Georgetown to act unlawfully.

42.     Defendant The Regents of the University of California ("Regents") owes and operates the University of California, Los Angeles ("UCLA") which is a public, highly selective university located in or near Los Angeles County, California and is a resident of Los Angeles County and a citizen of California.   All claims relating to UCLA are asserted against the Regents.   The individual at the university accepting bribes acted as a university representative, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing UCLA and Regents to act unlawfully.

### III.     JURISDICTION AND VENUE

43.     The Court has subject matter jurisdiction over the state law claims alleged in this Complaint pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A) because: (a) the matter in controversy exceeds the sum of $5 million, exclusive of interest and costs; and (b) some of the Class members are citizens of a state that is different from the citizenship of some of the Defendants.   In addition, federal question jurisdiction exists under 28 U.S.C. § 1331, in that Plaintiffs have alleged the violation of a federal statute (civil RICO).

44.     The Court has personal jurisdiction over Defendants USC, Stanford, and the Regents, Singer, The Key, and KWF because Plaintiffs' claims arise out of the business activities of those Defendants conducted in the State of California.

45.     The Court has personal jurisdiction over Defendants Yale University, Georgetown University, Wake Forest University, and UT-Austin because each of these universities has solicited students residing in California to attend their universities; have accepted money, including application fees, from students residing in California applying to attend their universities; have recruited athletes residing in California; have participated in college sports competitions in California; have websites accessible by students in California; have entered into contracts with California residents; have

- 6 -
**CLASS ACTION AMENDED COMPLAINT**

engaged in systematic and continuous business in California; and generally have minimum contacts in California sufficient to satisfy the Due Process Clauses of the California and United States Constitutions.  Moreover, Singer conducted nearly all of his bribery activity within California, and funneled bribery money to university employee representatives at Yale University, Wake Forest University, Georgetown University, and UT-Austin by using money from his for-profit business and charity business bank accounts located in California.

46.     Venue is proper in the Northern District of California because Defendants conduct a significant amount of business in this District and because Defendants have substantial contacts in this District.  Moreover, much of the fraudulent conduct which occurred took place within the Northern District of California, and Defendant Stanford resides in the Northern District of California. 28 U.S.C. § 1391; 28 U.S.C. § 84(a).

## IV.     ALLEGATIONS COMMON TO ALL COUNTS

47.     Defendant Singer owned The Key and served as Chief Executive Officer of KWF.

48.     The Key is a for-profit college counseling and preparation business that Singer founded in or about 2007 and incorporated in the State of California in or about 2012.

49.     KWF is a non-profit corporation in Newport Beach, California, that Singer established as a purported charity in or about 2012.

50.     In or about 2013, the Internal Revenue Service ("IRS") approved KWF as an exempt organization under Section 501(c)(3) of the Internal Revenue Code, meaning that KWF was exempt from paying federal income tax.  KWF maintained several bank accounts (collectively, the "KWF charitable accounts").

51.     Together, The Key and KWF constituted an "enterprise" as defined by 18 U.S.C. §1961(4) ("the Key Enterprise"), that is, an association, in fact, of entities engaged in, and the activities of which affected, interstate and foreign commerce ("the enterprise").  The Key Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

52.     The Defendant universities are highly selective universities. Typically, each university receives tens of thousands of applications and only accepts a very small percentage of applicants.

53.     Acceptance of a student into one of these universities often makes it easier for a student to obtain a high-paying job or career after graduation.

54.     The athletic teams of Georgetown, Stanford, UCLA, USC, UT-Austin, Wake Forest and Yale compete in most sports at the Division I level, the highest level of intercollegiate athletics sanctioned by the National Collegiate Athletic Association ("NCAA").

55.     Each of the Universities annually receives more than $10,000 in federal grants.

56.     All of the Defendant Universities require prospective students to submit standardized test scores as part of their application packages.

57.     When submitted, standardized test scores are supposed to be a material part of the admissions process at each of the Universities.  All of the Universities recruit student athletes and may apply different criteria when evaluating applications from students with demonstrated athletic abilities.  The consideration for applicants excelling in a sport is itself a common, objective criterion applicable to all applicants. Recruited student athletes at USC, for example, are typically considered by a designated, admissions sub-committee, which gives significant consideration to their athletic abilities and which frequently admits applicants whose grades and standardized test scores are below those of other USC students, including non-recruited athletes.

58.     The admissions offices at the Universities typically allot a set number of "slots" to each head coach of a varsity sport for that coach's recruited athletes.  At each of the Universities, the admissions prospects of recruited athletes are higher—and in some cases significantly higher—than those of non-recruited athletes with similar grades and standardized test scores.

59.     The principal purposes of the racketeering conspiracy in this case included the following:

      (a) to facilitate the admission of wealthy students to elite universities as recruited athletes, regardless of their athletic abilities; and

      (b) to enrich Singer and his co-conspirators personally.

60.     Singer was paid approximately $25 million by clients to bribe coaches and university administrators to designate the clients' children as recruited athletes, in violation of the duty of honest

services which the coaches and school administrators owed to their employers, thereby facilitating the applicants' admission to the Universities.

### A. Yale University Bribes

61.     As one example of the Student-Athlete Recruitment scam, Singer agreed in or about November 2017 to facilitate the admission of Sherry Gho, a Chinese student, to Yale, in exchange for a payment by Gho's family of $1.2 million.

62.     On November 13, 2017, Singer sent a falsified athletic profile to Rudolph "Rudy" Meredith, Yale's women's soccer coach.  The profile falsely described Gho as co-captain of a prominent club soccer team in southern California.

63.     In exchange for a promised bribe of $400,000, Coach Meredith designated Gho as a recruit for the Yale's women's soccer team, despite the fact that Meredith knew that Gho did not play competitive soccer.

64.     On or about January 1, 2018, after Gho was admitted to Yale, Singer mailed Meredith a check in the amount of $400,000, drawn on the KWF bank account.

65.     Relatives of Gho subsequently paid Singer approximately $1.2M in multiple installments, including approximately $900,000 that was directed to KWF as a purported charitable donation.

66.     Meredith began cooperating with the government when he was discovered in a Boston hotel room by undercover FBI officers trying to convince another parent, Morrie Tobin, to pay a $450,000 bribe to perpetuate this bribery scheme.

67.     On March 28, 2019, Meredith pleaded guilty to one count of conspiracy to commit honest services wire fraud, in violation of *18 U.S.C. Sec. 1349*, and one count of honest services wire fraud, in violation of *18 U.S.C. Secs. 1343 and 1346*.  He is scheduled to be sentenced on June 20, 2019.

68.     Meredith acted as a university representative and agent of Yale, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing Yale to act unlawfully.

**CLASS ACTION AMENDED COMPLAINT**

69.     On March 26, 2019, it was reported that Yale University rescinded the admitted student's admission.

70.     On March 15, 2019, Yale President Peter Salovey issued a statement calling the bribery scheme "…an affront to our community's deeply held values of fairness, inclusion, and honesty."  President Salovey further stated in part:

> …I have decided that we must conduct our own searching review in order to learn whether others have been involved in activities that have corrupted the athletic recruitment and admissions process. We will retain external advisors to assist us. They will be asked to recommend changes that will help us detect and prevent efforts to defraud our admissions process. As part of this review, we will specifically examine the practices of commercial admissions consultants, whose work is conducted out of the view of admissions officers.  Since her arrival on July 1, 2018, and before we knew of the federal investigation or its findings, Director of Athletics Victoria Chun independently had begun to put in place new policies and procedures regarding the oversight and assessment of our coaching staff. The goals of her initiatives are to ensure that student-athletes receive an excellent education at Yale and to enhance the quality of our athletic programs. In addition, going forward, Ms. Chun will conduct a review of coaches' proposed rosters of recruits before they are sent to the admissions office, and situations in which a recruited athlete fails to make a team will receive close scrutiny. These measures will help prevent opportunities for undermining the fairness and integrity of the Yale College admissions process.
>
> Ms. Chun is working with Dean of Undergraduate Admissions Jeremiah Quinlan to implement a code of conduct for athletic recruitment. They also will design even more robust training for all coaches to ensure they understand our recruitment procedures and the ethical expectations involved in supporting student-athletes in our admissions process.

All of these oversight steps could have, and should have, been taken by Yale prior to the admission of at least one student through this bribery scheme.

### B.  University of Southern California Bribes

71.     Singer's bribery scheme was rampant at the University of Southern California, and involved numerous USC officials and coaches involved in the admissions process, including Donna Heinel, the former Women's Athletic Director; Ali Khosroshahin, the former USC women's soccer head coach; Laura Janke, a former USC assistant women's soccer coach; and Jovan Vavic, the former USC men's water polo head coach.

72.     The scheme involved bribery payments paid through Singer to USC officials and departments, made by numerous parents, including those parents listed below.

**CLASS ACTION AMENDED COMPLAINT**

*(a)     Douglas Hodge*

73.     In September 2012, Douglas Hodge, a resident of Laguna Beach, California, who is the former CEO of a large investment management company based in Newport Beach, California, reached out to Singer for help getting his younger daughter into college at USC.

74.     On October 15, 2012, Singer, after receiving Hodge's daughter's transcripts, directed a bribe payment of $50,000 from his non-profit business account to a bank account in the name of a private soccer club controlled by Coach Khosroshahin and Coach Janke.

75.     Hodge's daughter's application to USC, submitted on December 16, 2012, stated that she was "co-captain of a Japanese national soccer team," and an "All-American" midfielder on a prestigious club soccer team in the United States.  Both of those claims were untrue.

76.     On February 12, 2013, Singer directed another bribe payment of $50,000 from his non-profit business to the private soccer club controlled by Khosroshahin and Janke.

77.     On February 13, 2013, Khosroshahin e-mailed Donna Heinel, the USC Women's Athletic Director, an athletic profile falsely describing Hodge's daughter as a "Top Drawer Estimated #3 recruiting class in nation," "All Ex Patriot Japan National Select Team Player," and a member of the "All National Championship Tournament Team." All of these claims were false, and Heinel knew them to be false. Donna Heinel was a central figure and participant in the college bribery scheme at USC.

78.     At USC, when a student sought admission as a student athlete, the student was required to submit an athletic profile to the USC Subcommittee for Athletic Admissions. Sometimes, the student would submit the profile to the Subcommittee directly, and other times, the profile would be forwarded to the Subcommittee by a USC coach, who would "champion" or recommend that student for admission based upon athletics.

79.     The Subcommittee typically met on Thursdays during the summer, fall and winter. The Subcommittee typically consisted of: (1) the Dean of Admissions; (2) Donna Heinel (the Women's Athletics Director); and (3) two admissions staff officers.

80.     Donna Heinel was, for all practical purposes, the "gatekeeper" and decision-maker at USC for student athletic admissions.  Typically, her recommendation or vouching for a candidate at the Subcommittee meeting would be accepted by the Dean of Admissions without question.

81.     On February 14, 2013, Heinel presented Hodge's daughter to the USC Subcommittee for Athletic Admissions as a purported soccer recruit, and recommended her admission to USC, knowing full well that the daughter's credentials as a star soccer player were fake.

82.     On March 26, 2013, USC mailed Hodge's daughter a formal acceptance letter.

83.     Less than two weeks later, on April 3, 2013, Singer e-mailed Hodge that he wanted to "follow up on next steps for [your daughter] and USC.  At your convenience please give me a call?"

84.     On April 5, 2013, Singer e-mailed Hodge instructions to direct a $150,000 payment to The Key, Singer's for-profit entity, and a $50,000 payment to KWF as a purported charitable contribution.  Hodge wired the money four days later as directed. The following day, Singer's office assistant sent Hodge a letter falsely claiming that "no goods or services were exchanged" for the $50,000 payment, so that Hodge could use the letter for tax deduction purposes.

85.     On or about May 15, 2013, Singer directed another $50,000 payment from KWF to the private soccer club controlled by Janke and Khosroshahin.

86.     Hodge's daughter matriculated at USC in the fall of 2013.  She did not join the USC soccer team.

87.     On July 28, 2013, Hodge e-mailed Singer, "Need to start discussion about the next one," referring to his son who was then a junior in high school.

88.     Hodge inquired from Singer whether Hodge's son was "really qualified" for USC. Singer responded, "No, but I can try to work a deal…maybe Basketball or Football will give me a spot since their kids are not that strong."  Hodge responded, "Understood.  I will talk to [my son] tomorrow."

89.     On January 28, 2015, Hodge's spouse e-mailed Singer, with a copy to Hodge, noting that she had not been able to find photos of the son who was applying to USC playing football, but had found photos of his brother playing football.  Singer forwarded the e-mail to Janke at USC and

1   wrote, "See below.  I am sure there is a tennis one too.  The boys look so alike I thought a football

2   player would help too?"

3          90.     On January 30, 2015, Hodge e-mailed Donna Heinel from USC.  "Thanks so much for

4   your time yesterday.  We are preparing [my son's] 'sports resume' as you requested and should be

5   ready to send it on to you early next week."  Heinel responded, "Great, looking forward to it…you

6   should concentrate on his primary sport with accolades and achievement, then add his secondary

7   sport."  Hodge forwarded the e-mail chain to Singer.

8          91.     Assistant Coach Laura Janke's primary role in the bribery conspiracy was to construct

9   and fabricate, for a fee paid by one of Singer's companies, a bogus "athletic profile" for Singer's

10  clients, listing fake athletic credentials and honors.

11         92.     Typically, the profile was accompanied by an "action photo" of the student

12  purportedly playing the chosen sport.  Often, Singer or his clients would use stock photos of other

13  athletes, or would Photoshop the client student's face or body into an athletic scene, to create the

14  impression that the student played that particular sport.

15         93.     Janke, on May 14, 2019, pleaded guilty to one count of conspiracy to commit

16  racketeering for her role in the scandal.  Her sentencing is scheduled for October 17, 2019.

17         94.     On January 30, 2015, Janke e-mailed to Singer two falsified athletic profiles of

18  Hodge's son—one relating to football, the other relating to tennis.  The football profile included

19  various, fabricated football achievements, including "Varsity Football Sophomore—Senior Year,"

20  "Team Captain-Senior Year," and "NH Independent Schools All-American Selection 2013, 2014."

21  In fact, records from the son's school indicate that he did not even play football in high school other

22  than his freshman year.  The tennis profile also included exaggerated tennis achievements, including

23  that the son was a member of the First Team Lakes Region League.

24         95.     Singer forwarded the fabricated profiles to Hodge and told him to download them and

25  send them on to Heinel, and to "ask her to use whichever one she likes. Obviously, we have stretched

26  the truth, but this is what is done for all kids.  Admissions just needs something to work with to show

27  he is an athlete.  They do not follow up after Donna [Heinel] presents….."

28

96.     Hodge then traveled to Japan and did not have time to send the falsified profiles to Heinel so he had Janke do it. When Heinel received the fake profile, Heinel replied with the athletic profile of a different student and a note that said, "An example of football."  In a separate e-mail, Heinel provided handwritten edits to the profile football and indicated that the existing photograph should be exchanged for a better picture that was "more athletic."

97.     Heinel presented Hodge's son to the USC Subcommittee for Athletic Admissions as a purported football recruit on February 12, 2015, and recommended his admission to USC, despite knowing full well that the student's football credentials were fake.

98.     On March 17, 2015, Janke e-mailed Singer and stated that she had just been advised by Heinel that Hodge's son's admission packet would go out on March 24, saying, "After the packet is received please let the father know to send the check directly to me at USC, make out to what we had discussed before.  Thank you!"

99.     Singer then forwarded this note on to Hodge and told Hodge, "I will need to take care of the different parties separately."  Singer told Hodge to let him know when the Acceptance was received so that "we can move forward financially."  "Fantastic!! Will do," replied Hodge.

100.    USC mailed Hodge's son a final acceptance letter on March 24, 2015.  One week later, Hodge mailed Heinel a $75,000 check payable to "USC Women's Athletic Board."  On April 1, 2015, Hodge wired $125,000 to The Key, and $125,000 to KWF.  Singer then directed a payment of $50,000 from KWF to a bank account controlled, in part, by Janke in the name of "SC Futbol Academy," a private soccer team.

101.    On April 10, 2015, KWF issued the phony tax letter to Hodge claiming that no goods or services were exchanged for his charitable contribution.

102.    On November 30, 2018, Hodge then had a tape-recorded conversation with Singer in which he admitted that the admission to USC for his son and daughter was fraudulent, and the two discussed what to say if IRS auditors questioned them.

**CLASS ACTION AMENDED COMPLAINT**

*(b)      John B. Wilson*

103.    In 2013, Singer ran a similar bribery scheme with parent John B. Wilson, a resident of Lynnfield, Massachusetts, who is a founder and CEO of a private equity and real estate development firm.

104.    In 2012, Wilson began working with Singer to get his son admitted to USC as a purported water polo recruit.

105.    The scheme involved bribing, among others, Jovan Vavic, the USC water polo coach, and Donna Heinel, the USC Athletics Director.

106.    On February 10, 2013, Wilson e-mailed Singer and asked for the "deadline to decide on side door for USC or BC or Georgetown, etc. this year" and to "confirm for which schools is side door really a viable option." Singer explained that Vavic was giving Singer one boys slot.

107.    On March 26, 2013, Wilson was worried that if his son got in through the USC "side door," the son's skill level might be so low as to be a "clear misfit at practice." Singer assured Wilson that his son would not actually be expected to play water polo for USC. Singer also explained that the son would be on the roster and would not have to attend all practices but would have to attend drug tests and other mandatory functions for one year, and then he could walk away.

108.    On August 24, 2013, Wilson e-mailed Singer about the timing of his bribe payments to Vavic and when the payments would be required.

109.    After an e-mail exchange on October 3, 2013, Singer provided Vavic with a falsified profile that included swimming times and awards.

110.    On January 21, 2014, Vavic asked Singer to confirm that Wilson's son was still interested in attending USC. Singer said yes. Vavic then said he would present Wilson's son to the USC Subcommittee as one of his "top walk-ons."

111.    On February 26, 2014, Vavic e-mailed a USC Athletics Administrator that Wilson's son "would be the fastest player on our team, he swims 50 y in 20 [seconds], my fastest players are around 22 [seconds], this kid can fly." Singer has advised that this purported performance figure was derived from the falsified athletic profile which he submitted to Vavic.

112.    On February 28, 2014, with the further assistance of Heinel, Wilson's son was admitted to USC as a water polo recruit.

113.    On March 1, 2014, one day later, Wilson e-mailed Singer under the subject line "USC fees." Wilson wrote: "Thanks again for making this happen! Pls give me the invoice. What are the options for the payment? Can we make it for consulting or whatever from the [K]ey so that I can pay it from the corporate account?" Singer replied that he could make the invoice for "business consulting fees," so that Wilson could "write off as an expense." Wilson replied, "Awesome!"

114.    On April 7, 2014, Wilson's company wired $100,000 to KWF as well as $100,000 to The Key, and $20,000 to Singer directly.

115.    On April 16, 2014, Singer withdrew a $100,000 cashier's check, made payable to "USC Men's Water Polo," from The Key's account. The "Purpose/Remitter" identified was "Wilson family."

116.    Wilson's son withdrew from the water polo team at USC after his first semester at school, and never played water polo again.

*(c)    Toby MacFarlane*

117.    On October 17, 2013, Singer wired $50,000 to a private soccer club controlled by Khosroshahin and Janke, setting up another "slot" for a potential student to be admitted to USC through bribery.

118.    In the fall of 2013, Singer began working with Toby MacFarlane, a resident of Del Mar, California who was a senior executive at a title company, with the plan to admit MacFarlane's daughter to USC through bribery.

119.    On October 25, 2013, Singer sent information about the daughter, including a photo, to Janke. A falsified soccer profile of MacFarlane's daughter was created by Janke, which falsely represented that the daughter a "US Club Soccer All American."

120.    On November 4, 2013, MacFarlane's daughter was presented to the USC Subcommittee for Athletic Admissions as a purported soccer recruit.

121.    On April 17, 2014, MacFarlane sent an e-mail to Singer with the subject line "Real Estate Consulting Invoice" and asked Singer to present him with a $200,000 invoice.

122.    On May 2, 2014, MacFarlane issued a $200,000 check to The Key with "Real Estate Consulting & Analysis" written in the memo line.

123.    On May 12, 2014, Singer caused The Key to issue a $100,000 payment to the private soccer club controlled by Khosroshahin and Janke.

124.    MacFarlane's daughter was admitted to USC as a purported soccer recruit, despite the fact that USC officials knew that her soccer credentials were fake.

125.    When a USC athletics academic counselor reached out to MacFarlane's daughter over the summer about changing her schedule of classes to accommodate travel for the soccer team, MacFarlane became concerned and contacted Singer, who told MacFarlane to have the daughter fake an injury—"Plantar Fasciitis."

126.    Macfarlane's daughter matriculated at USC in the fall of 2014 and graduated in 2018. She never played soccer at USC.

127.    MacFarlane then set about to get his son admitted to USC through bribery and contacted Singer.  On October 8, 2016, Singer made a note in his phone—[name of MacFarlane's son]—USC 250- 50 Donna[.]"

128.    On November 15, 2016, Singer asked MacFarlane for a photo of his son playing basketball.  MacFarlane's spouse said she would take the photo and send it.

129.    On November 27, 2016, Singer directed Janke to create a fabricated basketball profile for MacFarlane's son.  The profile falsely listed MacFarlane's son's height at 6'1" and indicated that the son played varsity on his high school basketball team from 2014 through 2016.  In fact, MacFarlane's son was only 5'5" tall and he did not play on the varsity team until his senior year.

130.    Singer sent the Janke-fabricated profile to Heinel in December 2016.

131.    Heinel presented MacFarlane's son to the USC Subcommittee for Athletic Admissions on January 26, 2017, and recommended his admission to USC, despite full knowledge that the son's basketball credentials were fake.

132.    On February 9, 2017, USC issued a letter to MacFarlane's son notifying him of his conditional admission to USC as a student athlete.

133.   On February 13, 2017, MacFarlane wrote a $50,000 check payable to USC Athletics. The memo line read "[name of MacFarlane's son] Women Athletic Board."

134.   USC notified MacFarlane's son that he was formally accepted on March 23, 2017.

135.   On April 18, 2017, MacFarlane paid Singer $200,000 via a check to the KWF charity. MacFarlane again wrote "Real Estate Consulting" in the memo line.

136.   MacFarlane's son attended USC briefly but withdrew in May 2018.  He never played basketball at USC.

137.   In a tape-recorded conversation on October 26, 2018, MacFarlane admitted paying $200,000 to get his daughter into USC and another $200,000 "essentially paid to USC for [your son] to get in through—to Donna Heinel to get in through men's basketball….."

138.   When Singer told MacFarlane that the IRS was auditing him, and MacFarlane expressed concern, Singer reassured MacFarlane not to worry because "there's hundreds of people involved. Hundreds."

(d)   *Bruce and Davina Isackson*

139.   Bruce and Davina Isackson are a married couple who live in Hillsborough, California. Bruce Isackson is the President of a real estate development company in Woodside, California.

140.   The Isacksons, after first using the bribery scheme with Singer to secure an admission of their older daughter to UCLA, embarked on a plan to bribe USC officials so that their younger daughter could be admitted to USC.

141.   The Isacksons first paid Singer bribe money so that Singer's imposter test-taker, Mark Riddell could take their daughter's ACT test for her.  Riddell, on April 12, 2019, pleaded guilty to conspiracy to commit mail fraud and honest services mail fraud; and to conspiracy to commit money-laundering.  His sentencing is scheduled to occur on July 18, 2019.

142.   With Riddell's assistance, the Isacksons' daughter obtained a score of 31 out of 36 on the ACT test.

143.   Using the fake ACT score, the Isacksons agreed with Singer that he should attempt to get their daughter admitted to USC as a purported rowing/crew recruit.

144.    In October 2017, Singer sent the Isacksons' younger daughter's transcript and fraudulently obtained ACT score to Donna Heinel, writing "Another crew girl," and directed Janke to create a crew profile for her.

145.    Janke made the falsified crew profile, which Singer forwarded to Heinel, falsely stating that the daughter was a "Varsity 8 Stroke" for the Redwood Scullers and listing several fake rowing credentials.

146.    On November 30, 2017, Heinel, using the fake ACT score and the fabricated athletic profile, presented the Isacksons' younger daughter to the USC Subcommittee for Athletic Admissions as a purported crew recruit, and recommended her admission to USC, despite knowing full well that the daughter's crew credentials were fake.

147.    On December 15, 2017, Heinel notified Singer that the Isacksons' daughter had been conditionally admitted to USC as a student athlete, and in the letter falsely stated that the "records" indicated that the daughter had "the potential to make a significant contribution to the intercollegiate athletic program as well as to the academic life of the university."

148.    On April 9, 2018, after the Isacksons' younger daughter was admitted to USC, a KWF employee e-mailed Davina Isackson a $250,000 invoice for the Isacksons' "generous donation to the Key Worldwide Foundation."

149.    On April 20, 2018, Bruce Isackson caused shares of stock with a value of $249,420 to be transferred to KWF.  Singer advised that he earmarked $50,000 of this payment for Donna Heinel, who in July 2018, began receiving monthly payments personally of $20,000 from KWF.

150.    On October 24, 2018, in a tape-recorded call, Bruce Isackson admitted that he made a payment to "Donna Heinel at USC to help [name of daughter] get in through crew."  Isackson admitted taking a tax write-off for the bribery payments.

151.    On December 3, 2018, in a meeting at the Isacksons' home with Singer, Bruce Isackson worried about being tape recorded and said that he was "paranoid" about the bribery scheme. Isackson was concerned that if the bribery scheme was discovered, it would be "the front page story." Isackson stated that if he participated in the test cheating scheme the next time, he would "definitely pay cash."

152.    On May 1, 2019, Davina Isackson pleaded guilty to one count of conspiracy to commit mail fraud and honest services mail fraud.

153.    Bruce Isackson on the same date pleaded guilty to conspiracy to commit mail fraud and honest services mail fraud; money laundering conspiracy; and conspiracy to defraud the United States.  The Isacksons are scheduled to be sentenced on July 31, 2019.

*(e)    Lori Loughlin/Mossimo Giannulli*

154.    Lori Loughlin and Mossimo Giannulli are a married couple living in Los Angeles, California  Loughlin is an actress, best known for her role on the television show "Full House."  Giannulli is a famous fashion designer.

155.    The Giannullis paid bribes totaling $500,000 to have their two daughters admitted to USC as crew recruits, despite the fact that neither daughter ever participated in crew.

156.    In July 24, 2016, Singer advised Giannulli that his oldest daughter's academic qualifications were at or just below the "low end" for admission to USC.  Thereafter, the Giannullis agreed with Singer to use bribes to facilitate her admission to USC as a recruited crew coxswain.

157.    On September 7, 2016, Giannulli sent Singer a picture of his daughter sitting on an ergometer.

158.    Heinel, using the fabricated profile, presented the older daughter to the USC Subcommittee on October 27, 2016 as a crew recruit, and recommended her admission to USC, despite knowing full well that the daughter's crew credentials submitted were entirely fake. At the meeting, the Giannulli's oldest daughter was conditionally admitted to USC.

159.    On October 29, 2016, Singer e-mailed Giannulli advising him to send $50,000 to "Donna Heinel, Senior Women's Associate Athletic Director, c/o USC Athletics."

160.    On November 1, 2016, Giannulli replied "I told biz mgr to Fed Ex today."

161.    Giannulli said he was going to Augusta in two weeks with the USC Athletic Director, and wondered if he should mention anything.  Singer said it was best to keep the Director out of it.  Singer said that when he met with the Director about the daughter a year ago, "he felt you were good for a million plus."  Giannulli responded, "HAH!"

**CLASS ACTION AMENDED COMPLAINT**

162.    On March 23, 2017, the daughter was accepted to USC.  One week later, Singer's office manager sent an invoice from KWF to the Giannullis for $250,000, telling them that "their pledge was now due."

163.    On April 10, 2017, Giannulli wired $200,000 to KWF.  KWF also provided a false letter for tax deduction purposes stating that no goods or services were exchanged.

164.    On the same date, Giannulli wrote Singer, thanking him for his work, and expressing a desire to conduct a similar bribery scheme for their next daughter.

165.    On July 14, 2017, Singer e-mailed Janke directing her to prepare a fake crew profile for the Giannullis' younger daughter.

166.    The profile indicated that the younger daughter would be represented as a coxswain for the L.A. Marina Club team, and requested the parents to send an "action picture."

167.    The Giannullis sent Singer a picture of the younger daughter on an ergometer.

168.    On November 2, 2017, Donna Heinel presented the Giannullis' younger daughter to the USC Subcommittee as a purported crew recruit, with the dummied athletic profile, and recommended her admission to USC, despite knowing full well that the crew credentials were entirely fake.

169.    Less than two weeks later, Singer advised the Giannullis that the younger daughter had been conditionally accepted to USC.

170.    On November 29, 2017, Singer directed the Giannullis to send $50,000 to USC and stated that the rest of the $250,000 would be paid to KWF after the daughter was formally accepted.

171.    The next day, the Giannullis' business manager sent USC a check for the $50,000.

172.    On February 6, 2018, the Giannullis wired $200,000 to the KWF charitable account.

173.    On March 23, 2018, USC granted the younger daughter's admission to USC.

174.    On April 12, 2018, Giannulli had an encounter with his daughter's high school counselor and the subject came up about whether the daughter was truly a coxswain.  The high school counselor e-mailed Giannulli, summarizing their conversation from that day.  The counselor stated that the counselor "shared with [the USC senior assistant director of admission] that you had visited this morning and affirmed for me that [the younger daughter] is truly a coxswain.

175.    This encounter appears to have worried Donna Heinel, who became afraid that interaction with high school counselors could lead to the scheme being discovered.  That day, she left Singer a voicemail which stated:

> I just want to make sure that, you know, I don't want the—the parents getting angry and creating any type of disturbance at the school.  I just want to make sure those students…if questioned at the school that they respond in a[n] appropriate way that they are, walk-on candidates for their respective sports.  They're looking forward to trying out for the team and making the team when they get here. OK?  That's what I just want to make sure of. [Inaudible]  So I just don't want anybody going into…[the Giannullis' daughter's high school], you know, yelling at counselors.  That'll shut everything down.

176.    When Heinel said "shutting everything down," she meant that interaction with high school counselors could result in the entire bribery operation being discovered.

177.    In a tape-recorded conversation on October 25, 2018, Singer told Giannulli that he was not going to say anything to IRS auditors about "your payments going to Donna Heinel at USC, through crew."  Singer stated, "It's funny.  Because Donna called me couple weeks ago and says, 'Hey, uh,' you know, 'going forward, can you use the same format you used for [the Giannullis' older daughter] and [their younger daughter] and the regattas that you put in there, for any girls, going forward, that don't row crew?'  So it's funny how—I thought I was just makin' stuff up."  Singer said "But they loved it."  Giannulli said "Uh, right. Perfect."

178.    In a November 29, 2018 tape-recorded conversation between Singer and Loughlin, Singer assured Loughlin that "nothing had been said about their donations helping the girls get into USC to do crew even though they didn't do crew."   The two then schemed about what to say to IRS auditors.

(f)    *Homayoun Zadeh*

179.    Homayoun Zadeh is a resident of Calabasas, California.

180.    In 2016, Zadeh conspired with Singer to bribe Heinel to get his daughter designated as a lacrosse recruit for admission to USC. Zadeh is an associate professor of dentistry.

181.    On December 8, 2016, Zadeh instructed his daughter's tutor to send Singer his daughter's transcripts. On December 16, 2016, Zadeh forwarded to Singer a photo of his daughter cheerleading.

182.    Singer forwarded the photograph to Janke asking her if there was any way to build a profile for Zadeh's daughter as a lacrosse candidate. Janke created a phony lacrosse profile for Zadeh's daughter and forwarded it to Donna Heinel on December 23, 2016.

183.    The profile falsely stated that the daughter was an elite player on two lacrosse teams in the Los Angeles area.

184.    Heinel then created a separate lacrosse profile for the daughter, on USC letterhead, which falsely stated that Zadeh's daughter was "one of the top defenders within the youth club development league," and was a player "who knows how to work as a team in order to win."  Heinel included fabricated comments that appear to be from the USC lacrosse coach.

185.    On March 15, 2017, Heinel, armed with the fake athletic profile, presented Zadeh's daughter to the USC Subcommittee for Athletic Admissions as a purported lacrosse recruit, and recommended her admission to USC, despite knowing full well that her athletic credentials were fake.

186.    In a lengthy exchange on March 20, 2017, Zadeh explained that his daughter was upset that her father was pressuring her to attend USC.  The daughter was concerned that she did not get in on her own merits.  She was concerned that others might view her differently.

187.    There was a discussion between the two about Zadeh making installment payments to Singer over six months.

188.    Between May 30, 2017 and September 7, 2018, Zadeh made installment payments to KWF totaling $55,000.

189.    On October 25, 2018, in a tape-recorded conversation between Singer and Zadeh, Singer assured Zadeh that he was not going to tell the IRS that he got his daughter into USC through lacrosse and Donna Heinel at USC. "Right," said Zadeh.  "And you know, we created a profile that wasn't real." "Right," said Zadeh.  The two then agreed that they should say the payment was for "underserved kids."

(g)    *Todd and Diane Blake*

190.    Todd and Diane Blake are a married couple living in Ross, California.  Todd Blake is an entrepreneur and investor.  Diane Blake is an executive at a retail merchandising firm.

191.    On January 29, 2017, Diane Blake e-mailed Singer, advising that their daughter was interested in attending USC but assumed that the school was "in the reach category."

192.    The Blakes and Singer decided to get the daughter admitted by fabricating a profile as a volleyball recruit.

193.    On August 7, 2017, Janke e-mailed Singer a falsified volleyball profile relating to the Blakes' daughter.

194.    One week later, Singer forwarded the profile to Heinel, falsely advising that the Blakes' daughter had volleyball experience and played on two club volleyball teams, one of which qualified her for the junior nationals three years in a row.

195.    On September 7, 2017, Heinel presented the Blakes' daughter to the USC Subcommittee for Athletic Admissions, and recommended her admission to USC, despite knowing full well that all of the volleyball credentials were fake.

196.    On September 14, 2017, the Blakes' daughter was conditionally approved for admission to USC.

197.    On September 14, 2017, Heinel sent a conditional acceptance letter to the daughter, again falsely claiming that her records indicate that she would be able to make a significant contribution to the intercollegiate athletic program.

198.    On September 16, 2017, Singer instructed Blake to make the first $50,000 payable to "USC Women's Athletics c/o Senior Women's Administration Donna Heinel."  Singer instructed that Blake should put "USC Women's Athletics" on the "payable to" line.  The same day, Blake sent the $50,000 check as directed.

199.    On February 5, 2018, Todd Blake wired $200,000 to KWF.

200.    The Blakes' daughter was formally admitted to USC on March 22, 2018.

201.    Although enrolled in the university, she is not listed on the roster for the women's volleyball team.

202.    In a tape-recorded conversation on October 25, 2018, Singer said to Blake that he was not going to tell the IRS that he got Blake's daughter into USC "through Donna Heinel with women's volleyball."  "Right," said Blake.

203.     Blake then asked Singer whether the fabricated sport was really volleyball, because Blake thought it was basketball.  Blake recalled getting a credit for the women's basketball department.  No, Singer assured him, it was volleyball.  Then Singer explained that "the money went towards her [Heinel] and she gets to decide where it goes within the department."

204.     Singer then advised Blake that he had a conversation with Heinel, in which she said that the profile for the Blakes' daughter for volleyball was awesome, and that future bribing parents seeking to get in through volleyball should just use the same profile as was used for the Blakes' daughter.

205.     On February 22, 2019, Singer had a similar tape-recorded call with Diane Blake, in which she admitted that her daughter got into USC by fabricating volleyball credentials.

*(h)     Devin Sloane*

206.     Devin Sloane is a resident of Los Angeles, California.  He is the founder and CEO of a Los Angeles-based provider of drinking water and wastewater systems.

207.     Sloane conspired with Singer to bribe Heinel to get his son admitted to USC as a water polo recruit, even though the son did not play water polo competitively.

208.     On June 5, 2017 and June 16, 2017, Sloane purchased water polo gear from Amazon.

209.     On June 26, 2017, Sloane received an e-mail from a graphic designer bearing the subject line, "Water polo photo—06/26/17."  The designer wrote:

> We researched a few water polo athlete images and the majority are cropped against a background so they can use them in promotional materials (and it takes out undesirable elements from the crowd etc.).  We were able to adjust the color and complete a clean extraction to mimic this look (attached)

210.     Sloane responded, "OK, but any chance to put him in a setting that looks like an outdoor [polo] pool? The graphic designer replied:

> We looked for a few shots yesterday but could not find one that was a solid fit (we're looking within istockphoto for the pool BG scene).  We'll keep looking and should have a few final examples today.

211.     On June 27, 2017, Sloane e-mailed Singer a photograph of his son purporting to play water polo, with his right arm and upper torso exposed above the water line.  Sloane asked if the photo would work.  Singer replied, "Yes, but a little high out of the water—no one gets that high."

212.    The next day, June 28, 2017, Sloane sent Singer a new photograph in which his son appeared to be lower in the water, with his torso and arm now mostly submerged.  Singer approved the photo.  In the photo, Sloane's son appears to be using items that Sloane purchased on Amazon.

213.    On July 14, 2017, Singer e-mailed Janke and directed her to create a fake water polo profile for Sloane's son.

214.    Singer advised that the fake profile would list the son as a "perimeter player" who played for the "Italian Junior National Team" and the "LA Water Polo" team.

215.    Heinel was given the fake profile and presented Sloane's son to the USC Subcommittee for Athletic Admissions in November 2017.  Heinel recommended Sloane's son for admission to USC, despite knowing full well that Sloane's son did not even play water polo and that the profile was fake.

216.    On November 16, 2017, Heinel sent Singer a conditional acceptance letter for Sloane's son.

217.    On November 29, 2017, Singer e-mailed Sloane, asking him to send a $50,000 check to USC, payable to "USC Women's Athletics," and to address the check to Donna Heinel.  He asked that the remaining $200,000 be sent to his charitable organization.

218.    The same day, Sloane sent the $50,000 check to USC Women's Athletics.

219.    On March 22, 2018, USC mailed Sloane's son a formal acceptance letter.

220.    On April 11, 2018, Sloane wired $200,000 to KWF.

221.    Subsequently, a guidance counselor at the Sloane son's high school contacted USC and questioned whether the son was really a water polo player.  On April 11, 2018, Heinel e-mailed the USC Director of Admissions, explaining why the son was admitted for water polo despite the high school having no water polo team.  Heinel then gave the Director a detailed, false account relating to Sloane's son's purported water polo play—an entirely fabricated story weaved from whole cloth:

> Wanted to complete the loop.  [Sloane's son] doesn't play on the men's water polo team at [his high school] because they do not sponsor water polo at his school.  He plays at LA Water Polo Club during the year and travels international during the summer with the youth junior team in Italy.  I don't know if the people at [his high school] are aware of his participation.  He participates in tournaments in Greece,

Serbia (how he met Jovan [Vavic]) and Portugal.  I believe the parents do have
money since he is enrolled in [his high school] plus is able to travel so extensively
during the summer.  He is small but he has a long torso but short strong legs plus
he is fast which helps him win the draws to start play after goals are scored.  He is
an attack perimeter player.  Thanks for bring [sic] to my attention.

222.     The Dean/Director of Admissions at USC should have had multiple alarm bells and

warning lights going off in his head that fraud was going on at USC.  In fact, the Dean himself

acknowledged that the high school counselor was "unusually skeptical" about Sloane's son's

participation in water polo abroad.  Nevertheless, the Dean/Director accepted Heinel's bogus

explanation and gave the issue no further consideration.

223.     The Dean/Director sent an e-mail to Heinel, stating:

Thanks for this.  If you don't mind, I'll pass an edited/paraphrased version of your
note along to the school, to assure them that we're looking at this stuff.  They
seemed unusually skeptical.  I think they do have a water polo team, but I wouldn't
expect it to be competitive.  It's a small school; I read a good deal about tennis,
some basketball, but not much else in the way of athletics.

224.     Singer then sent Sloane a script to use if further questioned by his son's high school.

The script specifically reiterated that Coach Vavic was a family friend, that the coach knew the son

from his water polo play in Europe.  The script encouraged Sloane to push back as to why high school

officials were questioning his son's application.

225.     Later, Heinel left Singer a voice mail, stating that she did not want anybody going into

the high school yelling at counselors, that such a move would "shut everything down."

226.     Sloane later explained in a call to Singer on August 30, 2018, that the USC Senior

Vice President for University Advancement called Sloane personally trying to probe Sloane about

possible interest in further donations to USC women's athletics.  Sloane lied and said that Sloane's

mother was an Olympic athlete and that the family was interested in the advancement of women in

sports.  Singer congratulated Sloane on his dishonesty, telling him that Sloane was "slick."

227.     On October 25, 2018, Singer, in a tape-recorded call with Sloane, stated that he was

being audited but that he would not tell the IRS about the $250,000 to get your son "into USC through

Donna Heinel for men's water polo."  "Uh-huh, yeah," said Sloane.  The two then agreed that Sloane

would say that he was giving the money to help "underserved kids."

228.    On May 13, 2019, Sloane pleaded guilty to an Information charging him with conspiracy to commit mail fraud and honest services mail fraud.  Sloane's sentencing is scheduled for September 10, 2019.

(i)    *Marci Palatella*

229.    Marci Palatella is a resident of Hillsborough, California.  She is the CEO of a liquor distribution company in Burlingame, California.    Palatella participated in a bribery scheme with Singer to get her son admitted to USC as a football recruit.

230.    After agreeing to have Singer arrange for an imposter (Mark Riddell) to take the SAT instead of Palatella's son, Riddell obtained a 1410 out of 1600 for the son on the SAT, and Palatella made arrangements with Singer to submit a falsified football profile.

231.    Palatella said she was willing to make a contribution of several hundred thousand dollars to get her son in as long as he never knew.

232.    Singer provided to Palatella a "price list," stating the amount it would take to get into the "side door" at various universities.  For USC, Singer said there was a 75% chance of admission with a "large but not significant" donation.  Singer advised that Georgetown and Boston College might be $750,000 to $1,000,000, which was the second level, but the first level was about $300,000 to $400,000.

233.    Palatella told Singer her son was not a realistic football recruit and was told that he was not big enough for college football.  Singer told him that football would give him the best shot because that is the sport where they let in students with the lowest grades.

234.    On July 27, 2017, Palatella e-mailed Singer a photo of her son in his football uniform. Singer forwarded the photo to Janke, who created a false and fabricated football profile for Palatella's son. The profile also included the fraudulently obtained SAT score.  The profile described him as a member of the defensive line and a "long snapper," and a member of several local and statewide championship teams between 2015 and 2017.

235.    The fabricated football profile was passed onto Donna Heinel, who, on November 16, 2017, presented Palatella's son as a football recruit to the Subcommittee on Athletic Admissions.

1  Heinel recommended Palatella's admission to USC, describing him as a talented "long snapper,"

2  despite knowing full well that the athletic profile was fabricated.

3      236.  On November 30, 2017, Heinel mailed a conditional acceptance letter to Singer for

4  Palatella's son.

5      237.  The next day, Palatella mailed Heinel a $100,000 check payable to the USC Women's

6  Athletic Board, with a note that said, "Our son…is beyond thrilled at the prospect of attending USC

7  as a freshman this fall."

8      238.  On March 22, 2018, USC mailed Palatella's son a formal acceptance letter.

9      239.  Six days later, Palatella was invoiced $400,000 by Singer.

10      240.  On April 1, 2018, Palatella wired the money to KWF.

11      241.  In a tape-recorded conversation on October 24, Singer told Palatella that Singer was

12  being audited, but that he would not tell the IRS about the "$400k plus, was—that we get through

13  Donna—to help [your son] get into USC through football."  When speaking about the bogus story to

14  be used, namely that the money to the foundation was being used to help kids in the communities,

15  Palatella stated, "That's—which is not even true, but (laughs). We made sure it was." Palatella told

16  Singer that she and her husband "laugh every day" about how grateful they were for Singer's services,

17  telling him "We're like, 'it was worth every cent.'"

18      *(j)*  *Gamal Abdelaziz*

19      242.  Gamal Abdelaziz, also known as Gamal Aziz, is a resident of Las Vegas, Nevada.

20  Until September 2016, he served as a senior executive of a resort and casino in Macau, China.

21      243.  Abdelaziz conspired with Singer to bribe Heinel to designate his daughter as a

22  basketball recruit in order to get his daughter admitted to USC.

23      244.  In 2017, Singer advised Abdelaziz that his daughter was unlikely to be admitted to

24  USC based upon her academic record, but that her prospects would improve dramatically as a

25  recruited athlete.  Based upon Singer's recommendation, a false basketball profile was created for the

26  daughter.

27      245.  On July 14, 2017, Singer e-mailed Janke, and asked her if she would be willing to

28  prepare fake athletic profiles for pay.  Two days later, Janke agreed to prepare the requested profile.

246.     Singer explained to Abdelaziz that the fake profile would state that the daughter was on the Beijing Junior National Team.  The profile later created by Janke provided, falsely, that the daughter was on the "Asia Pacific Activities Conference All Star Team," the "2016 China Cup Champions" team, and was the "Hong Kong Academy team MVP" and "Team Captain."    Janke asked Singer in an e-mail if he wanted any more awards or whether what she had provided was enough.

247.     On October 5, 2017, Heinel, using the fabricated basketball profile, presented Abdelaziz's daughter to the Subcommittee for Athletic Admissions, and recommended her admission to USC, despite knowing full well that her athletic profile was fabricated.

248.     On October 10, 2017, Heinel e-mailed Singer a provisional acceptance letter for the daughter.

249.     On December 4, 2017, Heinel instructed Singer that a payment of $200,000 for the daughter should be directed to the gift account for the Galen Center, the arena for USC's basketball and volleyball programs.

250.     Subsequently, Singer and Heinel agreed that, instead of directing money to USC, Heinel would receive payments of $20,000 per month personally in exchange for her assistance in securing the admission of Abdelaziz's daughter, and the children of Singer's other clients, to USC as purported athletic recruits.

251.     On March 26, 2018, Abdelaziz wired $300,000 to KWF.

252.     In July 2018, KWF began making monthly payments of $20,000 to Heinel personally.

253.     Abdelaziz's daughter matriculated at USC in the fall of 2018 but did not join the basketball team.

254.     On October 25, 2018, in a tape-recorded phone call, Abdelaziz was asked if he was okay with the fact that his $300,000 was paid to Donna Heinel at USC to get his daughter into school even though she was not a legitimate basketball player.  Abdelaziz replied, "Of course."

255.     When Singer told Abdelaziz that Heinel told him that any future bribing parents seeking to admit their children with a basketball profile should just use the Abdelaziz profile, Abdelaziz remarked, "Love it."

256.    On January 3, 2019, in another recorded telephone call, Singer told Abdelaziz that a question had arisen why his daughter had not showed up for practice.  Singer advised that Donna told them that the daughter had "plantar fasciitis."  Abdelaziz replied that he would use the same cover story.

*(k)    Elisabeth Kimmel*

257.    Elisabeth Kimmel is a resident of Las Vegas, Nevada and La Jolla, California.  She is the owner and president of a media company.

258.    Elisabeth Kimmel, in addition to using bribery to get her daughter admitted to Georgetown as a purported tennis recruit, sought Singer's assistance in bribing Donna Heinel so that her son would be admitted to USC as a purported pole vaulter.

259.    On August 10, 2017, Singer directed Janke to create an athletic profile for Kimmel's son.  Janke asked what sport and Singer replied, "Pole vaulter."

260.    Janke prepared an athletic profile falsely describing the son as an elite high school pole vaulter and including a photograph of a pole vaulter which supposedly depicted the son, when, in fact, the photo was of a different person altogether.

261.    The son's high school has no record of him participating in pole vaulting or track and field.

262.    On August 18, 2017, Singer forwarded the false profile to Heinel, writing, "Per our discussion today. Thanks."

263.    In early October 2017, Heinel, in possession of the bogus profile and dummied photograph, presented Kimmel's son to the USC Subcommittee for Athletic Admissions as a pole vaulting recruit.  Heinel recommended his admission to USC, despite knowing full well that his athletic credentials were fake.

264.    On October 10, 2017, Heinel gave to Singer the conditional acceptance letter for Kimmel's son.

265.    On October 23, 2017, the Meyer Charitable Foundation made a $50,000 payment to the USC Women's Athletic Board.  The check was signed by Kimmel's spouse. The Meyer Charitable Foundation is a charity founded by Kimmel and her relatives.

266.   It is not lawful for a charity to spend money for the personal use and bribes of an officer of the charity.

267.   On November 28, 2017, Kimmel noted that the application prepared for her son to submit inadvertently failed to include information for "pole vaulter."  Singer pulled the application and corrected it to make sure it included "3 year Varsity Letterman" in track and field and "one of the top pole vaulters in the state of California"—all of which were false.

268.   On February 23, 2018, the Meyer Charitable Foundation issued a check to KWF in the amount of $200,000.  The check was signed by Kimmel.  Again, this broke multiple laws.

269.   On March 22, 2018, Kimmel's son was admitted to USC.

270.   On July 26, 2018, Kimmel and her spouse contacted Singer, concerned that their son's advisor at USC had inquired about his status as a track athlete, and their son had responded that this had to be a mistake.  The son was apparently unaware that he had been accepted by USC as a recruited athlete.  The advisor said he would "look into" the designation of his son as an athlete.  Singer advised her not to worry about it.  Singer stated, "Well if the advisor [keeps asking], she's gonna call the person who's responsible for all of this, that's the person who got [your son] admitted, and she'll just say he decided not to compete."

271.   When the son later kept getting notifications about practices, Singer forwarded the parents' e-mail to Heinel, who said she would take care of it tomorrow.  The son subsequently stopped receiving notifications about athletic practice.

272.   In a tape-recorded phone conversation on January 3, 2019, Kimmel and Singer discussed the fact that athletes admitted to USC with fake credentials typically failed to show up for practice.  Singer explained that the coaches' boss is Donna Heinel, and that Donna Heinel put the students on the "recruited walk-on list, which happens all the time, and they just don't show up for practice, and that's fine.  Coaches are okay with that because, essentially, donations are going to help their programs, and they know that."

(l)    *William E. McGlashan, Jr.*

273.   William McGlashan is a resident of Mill Valley, California.  He is a senior executive at a global private equity firm.

274.    With Singer's help, McGlashan's son falsely received a score of 34 on the ACT. McGlashan then set out to get his son admitted to USC through bribery and the use of the fabricated ACT score.

275.    Singer explained the bribery scheme to McGlashan, who said "I love it."  Singer assured McGlashan that he had created fake profiles for other students "a million times."

276.    On August 22, 2018, Singer left McGlashan a voice mail stating that because the son's high school did not have a football team, Singer was going to make him a "kicker/punter."  Singer advised that he would get a picture and Photoshop it to look like the son was a kicker.  Singer advised that he had a friend who ran a kicking camp, so he would put a lot of that on the profile.

277.    Singer bragged to McGlashan that he made another student a long snapper, and McGlashan said, "I love it.  I love it.  That is so funny."

278.    When Singer later asked for a photo of the son to Photoshop his face onto the body of a kicker, McGlashan laughed and said, "Okay.  Okay.  Let me look through what I have.  Pretty funny.  The way the world works these days is unbelievable."

279.    Singer told McGlashan about another student he made into a water polo player, and when he looked at the photo he saw that the boy was way too high out of the water.  McGlashan said, "That's funny."

280.    After the college bribery scandal broke out, McGlashan's son allegedly withdrew his college applications.

(m)    *Agustin Huneeus, Jr.*

281.    Agustin Huneeus is a Napa Valley vintner and a resident of San Francisco, California. Huneeus conspired with Singer to bribe Heinel and Jovan Vavic, the water polo coach, in order to get his daughter admitted to USC.

282.    After paying bribe money and participating in the test cheating scam, Huneeus' daughter received a falsified 1380 out of 1600 on the SAT.  Huneeus then set about to bribe USC college officials through Singer.

283.    Singer explained to Huneeus that at USC there are subcommittee meetings every Thursday, where the Dean of Admissions, two admissions staff officers, and Donna Heinel are present

to go over student athlete applications.  Singer explained that a false athletic profile would be provided for his daughter.

284.    Huneeus acknowledged that his daughter was not qualified to be a USC water polo recruit, saying the daughter "is not worthy to be on that team," and expressed concern about "this thing blow[ing] up in my face."  Singer assured him that it had not blown up in 24 years.

285.    Huneeus asked Singer what would happen if some article came out saying that "the polo team is selling seats into the school for 250 grand."  Singer said "Well, no, because she's a water polo player."  Huneeus responded, "But she's not...."

286.    On September 20, 2018, Singer sent Heinel an e-mail that included Huneeus' daughter's high school transcripts, fraudulent SAT score, and a fabricated athletic profile that falsely identified her as a "3-Year Varsity Letter Winner" in water polo, and "Team MVP 2017," along with a photograph.  The photograph depicted a completely different individual.

287.    On September 22, 2018, Singer advised Huneeus that because his daughter had not given him the photo in time, Singer had sent in a photo of someone else.

288.    When asked about the payments to USC, Singer advised Huneeus that "the folks at USC...tell me where that money goes."

289.    Singer advised Huneeus that there was a special freshman orientation date for athletes, but that his daughter should ignore that orientation and go to the regular freshman orientation so that she would no longer be part of athletics.

290.    On November 2, 2018, Heinel, in possession of the fake athletic profile and a photo of an entirely different individual, presented Huneeus' daughter to the Subcommittee for Athletic Admissions as a water polo recruit, and recommended her admission to USC.  Heinel was supported in her effort by Jovan Vavic, the water polo coach at USC.  Heinel knew full well at the time of presentation to the Subcommittee that Huneeus' daughter's athletic profile was entirely fabricated.

291.    On November 7, 2018, Heinel mailed a conditional acceptance letter to Singer for Huneeus' daughter.

292.    On November 19, 2018, Huneeus caused his executive assistant to send a $50,000 check to Heinel by FedEx, payable to "USC Women's Athletic Board," with the memo line referencing his daughter.

293.    In a tape recorded call on November 29, 2018, when Singer advised Huneeus that he would not be telling the IRS about Huneeus' bribe payments, Huneeus responded, "Dude, dude, what do you think, I'm a moron?  …  I'm going to say that I've been inspired how you're helping underprivileged kids get into college.  Totally get it."

294.    On May 21, 2019, Huneeus pleaded guilty to an Information charging him with conspiracy to commit mail fraud and honest services mail fraud Huneeus' sentencing is scheduled for October 4, 2019.

(n)    *Robert Zangrillo*

295.    Robert Zangrillo is a resident of Miami, Florida and is the founder and CEO of a Miami-based private investment firm.

296.    Zangrillo conspired with Singer to bribe Heinel to have his daughter admitted to USC as a rowing recruit.

297.    In 2017, Zangrillo's daughter applied to USC and was rejected.  She then attended a different school.

298.    On February 1, 2018, she submitted a transfer application to USC.  This application, unlike her earlier one, falsely represent that she was a member of a crew club and rowed crew for 44 hours per week.

299.    On Zangrillo's behalf, Singer contacted the USC rowing coach, who agreed to facilitate the transfer application of Zangrillo's daughter "as though she's been sculling and rowing." The USC rowing coach, in a telephone call with Singer, said, "Okay, I will take her.  You guys help us, we'll help you.  I'll take her, I just need her to finish all these credits and all the—all of her classes."

300.    Singer then arranged for another third party hired by Singer, Mikaela Sanford, to take online courses in place of Zangrillo's daughter to get her grades up.

1    301.    On June 14, 2018, USC offered Zangrillo's daughter admission as a transfer student

2    conditioned on her maintaining a 3.3 GPA or higher in at least 12 transferable units in the Fall of

3    2018 with no grade lower than a C.

4    302.    On June 26, 2018, Heinel stated to Singer that she had not presented Zangrillo's

5    daughter to the Admissions Department as an athletic recruit, but instead had "advocated for her" and

6    placed her on a "VIP list for transfers."

7    303.    On September 20, 2018, Zangrillo, after receiving an invoice from Singer, wired

8    $200,000 to KWF.  On the same day, Zangrillo mailed a check for $50,000 to "USC Women's

9    Athletics," as directed by Singer.

10    304.    On a tape-recorded call on January 3, 2019, Zangrillo confirmed he would not say

11    anything about Singer getting Zangrillo's daughter into USC because of a payment to athletics.

12    *(o)    Michelle Janavs*

13    305.    Michelle Janavs is a resident of Newport Coast, California.  She is a former executive

14    at a large food manufacturer formerly owned by members of her family.

15    306.    Janavs participated in the athletic recruitment scam and a test cheating operation

16    arranged by Singer and conspired with Singer to have her daughter admitted to USC as a purported

17    beach volleyball recruit.

18    307.    After participating in the test cheating scam in 2017, Janav's daughter obtained a 32

19    out of 36 on the ACT.

20    308.    In the fall of 2018, Janavs also provided information to Singer to create a false athletic

21    profile.  While Janav's daughter played volleyball in high school, she did not play competitive beach

22    volleyball.

23    309.    On August 24, 2018, Singer asked Janavs for an action photo of his daughter playing

24    both indoor and beach volleyball, which Janavs provided two days later.

25    310.    On October 1, 2018, Singer told Janavs that Heinel planned to present the daughter as

26    a beach volleyball player, and explained where to send the bribe payments.

27

28

**CLASS ACTION AMENDED COMPLAINT**

311.    On October 3, 2018, Heinel, in possession of the fake profile, presented the daughter to the USC Subcommittee for Athletic Admissions, and recommended her admission to USC, despite knowing full well that the athletic profile was fake.

312.    On October 17, 2018, Singer forwarded to Janavs the conditional acceptance letter for his daughter.

313.    On October 26, 2018, Janavs mailed a $50,000 check payable to the USC Women's Athletic Fund.

314.    In a call on January 3, 2019, Singer told Janavs that Heinel had been questioned about why Janav's daughter was on the volleyball recruit list.  Singer told Janavs what to say if he was questioned about his daughter.

315.    Despite Heinel's facilitation of the admissions of all these students with fabricated athletic profiles, Heinel was known to be a stickler for the rules when it came to other students who did not participate in the bribery scheme.

316.    For example, in 2011, the USC track and field coach Ron Allice tried to push Heinel for admission to USC of an athlete (a hurdler named Jonathan Cabral) for his track and field team. Cabral had taken a sign language class to fulfill a foreign language requirement.  Even though that practice was standard in the state university systems, Heinel dug in against Cabral's admission.

317.    Cabral ended up at USC's PAC-12 rival, Oregon, where he would finish second in the NCAA finals in the 110-meters hurdles as a senior.  A year later, he finished sixth during the 2016 Olympics while representing Canada.  Yet Cabal was not worthy enough for admission under Heinel's strict standards.

318.    Tom Walsh, a former cross-country coach who left USC in 2013 after 19 years, stated that coaches sweated the days when they had to attest to the worthiness of their recruits to Heinel, and said getting past Heinel was "as hard as it gets."

319.    Despite have rigorous admission standards for students whose parents did not pay bribes, Heinel engaged in an almost decade-long conspiracy with Singer to admit unqualified students with fabricated athletic profiles to USC.  Heinel was, in essence, the gatekeeper between 2011 to 2019

1   for athletic recruits to gain admission to USC.  Therefore, all of Heinel's actions and all of Heinel's

2   knowledge are attributable to USC itself.

3       320.   Over $2 Million in checks from Singer and his foundation were given to Heinel at

4   USC, who controlled the funds and could distribute them wherever she chose, in addition to the

5   personal bribes given to Heinel.  USC officials and departments received millions of dollars of bribe

6   money as a result of this fraudulent scheme.

7       321.   Heinel, Khosroshahin, Janke, and Vavic acted as USC representatives and agents, as

8   they were vested with authority to make admissions decisions or with substantial influence over

9   admissions decisions, thus causing USC to act unlawfully.

10      322.   The "Concerned Faculty of USC," a group of about 350 professors, said in a statement

11  in March 2019 decrying the scam, "USC is again at the center of a scandal involving corruption,

12  greed, and a failure of administrative oversight and accountability." In its statement, the faculty group

13  called on university administrators to appoint a faculty-led committee to oversee an investigation of

14  admissions and athletics. "USC's handling of past wrongdoing has engendered so much distrust in

15  our community that we bear an extra burden to act on this case with the highest level of transparency,

16  accountability, and faculty governance," the professors wrote.

17      323.   USC spokesperson Eddie North-Hager told BuzzFeed News that USC had identified

18  six students linked to the scheme in the "current admissions cycle" (2018-2019) and that those

19  students would be denied admission.

20                          **C.  Georgetown University Bribes**

21      324.   Between 2008 and 2018, Singer made payments to a Georgetown tennis coach named

22  Gordon "Gordie" Ernst bribes, falsely labeled as "consulting" fees, totaling more than $2.7 million.

23  Singer typically made the payments from one of the KWF charitable accounts and sent them to the

24  coach via U.S. Mail, including in several instances to the coach's residence in Falmouth,

25  Massachusetts.

26      325.   In exchange for the bribes, the Georgetown coach, over the period of 2012 to 2018,

27  designated approximately twelve applicants as recruits for the Georgetown tennis team, including

28

1    some who did not play tennis competitively, thereby facilitating their admission to the university.

2    Ernst has been criminally charged with conspiracy to commit racketeering.

3        326.    Some of this recruiting involved the individuals listed below.

4        (a)    Douglas Hodge

5        327.    On February 4, 2008, Singer advised Douglas Hodge that he had spoken to Gordon

6    Ernst, the Georgetown tennis coach, and that Ernst had "helped me get in two girls last week." Singer

7    advised that Ernst was ready to help get Hodge's child into Georgetown.

8        328.    Singer told Hodge that his daughter, without the bribery assistance, had only a 50%

9    chance at best of getting into Georgetown.

10       329.    The application submitted to Georgetown by Hodge's daughter on November 4, 2008

11   showed that she had won multiple United States Tennis Association tournaments.  In fact, USTA

12   records reveal that Hodge's daughter never played in a USTA match.

13       330.    On December 23, 2008, after Ernst promoted Hodge's daughter for admission,

14   Georgetown gave the daughter a conditional acceptance letter.

15       331.    Hodge's daughter attended Georgetown but did not play tennis on the Georgetown

16   team.

17       (b)    Elisabeth Kimmel

18       332.    Kimmel participated in a bribery scheme to use bribery to facilitate her daughter's

19   admission to Georgetown as a purported tennis recruit.

20       333.    Kimmel's daughter's application to Georgetown in 2012 stated falsely that she played

21   "Southern California Junior Tennis" throughout high school and was a "ranked player."  In fact, the

22   USTA, which runs the program referenced, has no record of Kimmel's daughter's participation.

23       334.    On December 20, 2012, the Georgetown admissions department sent Kimmel's

24   daughter a conditional acceptance letter, stating that it was at the request of Gordie Ernst, Tennis

25   Coach.

26       335.    Kimmel's daughter matriculated at Georgetown in the fall of 2013 and graduated in

27   May 2017.  She was not a member of the Georgetown tennis team during her four years at

28   Georgetown.

**CLASS ACTION AMENDED COMPLAINT**

*(c)     Stephen Semprevivo*

336.     Stephen Semprevivo resides in Los Angeles, California.   He is an executive at a privately held provider of outsourced sales teams.

337.     Semprevivo conspired with Singer to bribe tennis coach Gordon Ernst to have his son admitted to Georgetown as a tennis recruit, even though he did not play tennis competitively.

338.     Ernst forwarded an e-mail from Semprevivo's son to a member of the Georgetown admissions staff, and then e-mailed the admissions officer to confirm that he had used three of his allocated admissions "spots"—one for Semprevivo's son and two for two other clients of Singer.

339.     On August 26, 2015, Singer noted in his e-mail account "Semprevivo $400,000 Gtown."

340.     On October 11, 2015, Singer e-mailed Semprevivo and his son an "activity" essay for inclusion in his Georgetown application. The essay stated that "the sport I put my most energy into is tennis."

341.     Semprevivo's application falsely stated that he had played tennis during all four years of high school and was ranked in singles and doubles.  The application falsely listed him as a "CIF Scholar Athlete" and "Academic All American" in tennis and basketball and stated that he had made the "Nike Federation All Academic Athletic Team" in tennis.  College applications submitted by Semprevivo's son to other colleges did not list tennis.

342.     On November 6, 2015, Georgetown sent the son a conditional acceptance letter, stating that it was "at the request of Mr. Gordie Ernst, Tennis Coach."

343.     On April 22, 2016, after the son was formally admitted to Georgetown, the Semprevivo family trust issued a check to KWF marked as a "private contribution."

344.     Singer then made numerous payments from the KWF account to Ernst.  Between September 11, 2015 and November 30, 2016, Singer caused KWF to issue checks to Ernst totaling $950,000, representing payments from Semprevivo and other parents.

345.     Semprevivo's son matriculated at Georgetown in the fall of 2016.  Since enrolling, he has not joined the tennis team.

346.     On October 25, 2018, in a tape recorded phone call, Singer told Semprevivo's spouse that he was being audited by the IRS, and obviously, he would not tell them that the payment to Ernst which helped the son get into Georgetown and the fact that the son was obviously not a tennis player. "Okay," said the spouse.

347.     On December 3, 2018, Singer made a similar recorded phone to Semprevivo, in which they plotted about what to say about the $400,000 payment and the fact that the son was not a tennis player.

348.     On May 7, 2019, Semprevivo pleaded guilty to an Information charging him with conspiracy to commit mail fraud and honest services mail fraud.  His sentencing is scheduled for September 11, 2019.

*(d)     Elizabeth and Manuel Henriquez*

349.     Elizabeth and Manuel Henriquez are married and reside in Atherton, California. Manuel Henriquez is the founder, CEO and chairman of a publicly traded specialty finance company based in Palo Alto, California.

350.     The Henriquezs conspired with Singer to bribe Coach Gordie Ernst in order to get their daughter admitted to Georgetown as a purported tennis recruit.

351.     After participating in the test cheating scam, their daughter received an inflated score on the ACT.

352.     Manuel Henriquez was an alumnus and former member of the Northeastern University Corporation, one of Northeastern University's governing bodies.  Henriquez agreed to help Singer secure the admission into Northeastern of a different client of Singer's in exchange for Singer helping him get his daughter admitted to Georgetown.

353.     The student in question was ultimately accepted at Northeastern based upon Henriquez's influence.

354.     On August 24, 2015, Singer gave to Henriquez's daughter a draft application essay. Singer changed the essay to "talk about tennis."  The essay then talked about the daughter's rigorous tennis workouts and meeting Coach Ernst.

355.    The Henriquez's daughter's application was submitted to Georgetown on October 25, 2015.  The application falsely stated that the daughter played "club tennis all through high school and had a "top 50" ranking in the USTA Junior Girls Tennis for sophomore through senior years, and was also on the USTA-All-Academic Team for tennis her junior and senior years.  Records from USTA show that she never participated in a single USTA tournament in high school.

356.    Her overall win/loss record in tennis was 2-8.

357.    On November 6, 2015, "at the request of Mr. Gordie Ernst, tennis coach," she was given a conditional acceptance letter.

358.    On May 4, 2016, the Henriquez Family Trust wired $400,000 to KWF.

359.    On October 24, 2018, in a tape-recorded call, Elizabeth Henriquez was told by Singer that he was being audited, but that he would not tell the IRS that the Henriquezs had paid bribe money to Singer so that an imposter could take the daughter's ACT test, or that they had paid Gordie Ernst to bribe their daughter's way into Georgetown.  Henriquez stated "Okay," and asked what Singer's "story" would be.

360.    In a tape-recorded call on January 27, 2019, Singer told Manuel Henriquez that there was no paper trail because Henriquez had helped get the other client of Singer's into Northeastern.  Henriquez agreed and then the Henriquezs and Singer plotted on what lie to tell if they should be questioned.

361.    Ernst acted as a Georgetown representative and agent, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing the university to act unlawfully.

### D.  UCLA Bribes

362.    Bruce and Davina Isackson conspired with Singer in 2016 to bribe Jorge Salcedo, the UCLA men's soccer coach, so that their daughter could be admitted to UCLA.

363.    On May 20, 2016, Ali Khosroshahin, at the behest of Singer, forwarded a falsified athletic profile for the Isackson's daughter to Jorge Salcedo, representing her to be a competitive soccer player.

364.    On June 28, 2016, based upon the activities of Salcedo and the falsified profile, the UCLA student-athlete admissions committee approved the Isacksons' daughter provisionally as a soccer recruit.

365.    On July 7, 2016, Singer directed a payment from KWF to a sporting marketing company controlled by Salcedo.  Singer also caused a check to issue to Khosroshahin in the amount of $25,000.

366.    On July 8, 2016, Singer invoiced Isackson for $250,000.

367.    On July 11, 2016, Bruce Isackson sent an e-mail to Singer, wanting assurances that if the daughter was not accepted to UCLA, the $250,000 "gift" would be returned.

368.    The same day, Singer confirmed that he would return the gift if the daughter was not admitted.

369.    On July 15, 2016, Isackson transferred 2,150 shares of Facebook stock, having a value of $251,249 to KWF.

370.    On May 1, 2019, Davina Isackson pleaded guilty to one count of conspiracy to commit mail fraud and honest services mail fraud.

371.    Bruce Isackson, on the same date, pleaded guilty to conspiracy to commit mail fraud and honest services mail fraud; money laundering conspiracy; and conspiracy to defraud the United States.  The Isacksons are scheduled to be sentenced on July 31, 2019.

372.    Jorge Salcedo and Singer also conspired to help at least one other student to be admitted to UCLA through bribery.

373.    Published reports suggest that Singer paid Salcedo $200,000 in bribes for his help in getting the two students admitted to UCLA.

374.    Salcedo acted as a UCLA representative and agent, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing the university to act unlawfully.

**CLASS ACTION AMENDED COMPLAINT**

**E.  Wake Forest University Bribes**

375.    In 2017, Singer directed $100,000 from one of the KWF charitable accounts to accounts controlled by William "Bill" Ferguson, the women's volleyball coach at Wake Forest University.

376.    The payments included $10,000 to the Wake Forest Deacon Club, $40,000 to Wake Forest Women's Volleyball, and $50,000 to a private volleyball camp which the Wake Forest coach controlled.

377.    In exchange for this money, the Wake Forest coach agreed to designate the daughter of one of Singer's clients—who had previously applied to Wake Forest and been placed on the wait list—as a recruit for the women's volleyball team, thereby facilitating her admission to the university.

378.    This applicant did not play on the women's volleyball team.

379.    Ferguson acted as a Wake Forest representative and agent, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing the university to act unlawfully.

**F.  Stanford University Bribes**

380.    In the fall of 2017, Singer conspired with the Stanford sailing coach, John Vandemoer, to designate one of Stanford's clients as a recruit for the Stanford sailing team, despite the fact that the applicant had no sailing credentials.

381.    In support of the student's application, Singer created a fake student-athlete profile that was submitted to Stanford, and falsely suggested that the applicant was a competitive sailor.

382.    The applicant was admitted based upon Vandemoer's recommendation, but in May 2018, the applicant decided to defer his application to Stanford for one year.  Thereafter, Singer directed a payment of $110,000 from one of the KWF charitable accounts to the Stanford sailing program in exchange for Vandemoer's agreement to designate that applicant as a sailing recruit in the following year's recruitment cycle.

383.    In the summer of 2018, this applicant decided to attend a different university. Vandemoer and Singer jointly agreed that Singer would be able to use the spot for another one of Singer's clients, in exchange for a $500,000 payment to the Stanford sailing program.

384.    Singer later directed a payment of $160,000 from KWF to the Stanford sailing program, and Vandemoer agreed to again hold the spot open for a parent who wanted to bribe their way into Stanford.

385.    In October 2018, John B. Wilson advised Singer that he wanted to pursue "side door" opportunities for his daughter at Stanford and Harvard.

386.    On October 17, 2018, Wilson wired $500,000 to KWF.

387.    On October 27, 2018, Singer advised Wilson that he had secured a "side door" deal for one of Wilson's daughters at Stanford University, by a bribery scheme which involved the Stanford sailing coach, John Vandemoer.

388.    Singer advised Wilson that he had given Vandemoer $160,000 for his sailing program in order to secure a spot for one of Singer's clients in the next year.

389.    John Vandemoer has since agreed to plead guilty to a charge of racketeering conspiracy in violation of 18 U.S.C. Sec. 1962(d).

390.    In support of the student's application, Singer, together with others, created a student-athlete "profile" that was submitted to Stanford, and that falsely suggested that this Stanford applicant was a competitive sailor.

391.    It has recently been reported that the parents of another Stanford student, Yusi Zhao, the daughter of a Chinese billionaire, worked with Singer to facilitate Zhao's admission into the university.

392.    Zhao's parents reportedly "donated" $6.5M to Singer's foundation.

393.    The foundation, in turn, gave three donations to Stanford totaling $770,000.

394.    Singer designated Zhao as a purported sailing recruit.

395.    Vandemoer acted as a Stanford representative and agent, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing the university to act unlawfully.

396.    In an August 22, 2018 phone message from Singer to William McGlashan, who was interested in whether Singer could get McGlashan's son into Stanford, Singer represented that he had

1    tried to work a "side door" with Stanford for the son, but "Stanford said no, too tough, grades too

2    low, just don't want to make an exception right now for him."

3        397.    Stanford, in April 2019, reportedly expelled at least one student who allegedly was

4    admitted as a result of the bribery scheme with Singer.

5        398.    Stanford President Marc Tessier-Lavigne and Provost Persis Drell issued a statement

6    proclaiming that this was "nothing short of appalling."  The two chief administrators wrote: "Let us

7    be clear: The conduct reported in this case is absolutely contrary to Stanford's values, and to the

8    norms this university has lived by for decades. Today's news is a shock exactly because it so clearly

9    violates our institutional expectations for ethical conduct."

10       399.    Stanford changed its procedures after the indictments in this case, and now athletic

11   recruits proposed by coaches will undergo a separate background check by a Stanford Athletics

12   executive. It has been reported that previously, only the recommending coach was responsible for

13   reviewing such credentials.  These changes should have been implemented before the bribery scandal

14   occurred.

## G.  University of Texas at Austin Bribes

16       400.    On or about 2015, Singer paid Michael Center, the head tennis coach at UT-Austin,

17   approximately $100,000, to facilitate the admission of the son of Chris Schaepe to UT- Austin.

18       401.    In exchange for this bribe, the UT-Austin coach designated the Schaepe's son, who

19   did not play tennis competitively, as a recruit for the university's tennis team, thereby facilitating his

20   admission to UT-Austin.

21       402.    Former Regent of UT-Austin Wallace Hall had blistering criticism of the school

22   administrators relating to the college bribery scandal, stating that UT-Austin did not have "…the

23   appropriate safeguards in place to ensure the wealthy and powerful can't short-circuit the normal

24   admissions process."  "Politicians who take money and free dinners from people and then get their

25   kids into universities," said Hall, "are engaging in the same *quid pro quo* arrangements as the guy

26   who got caught taking cash for the same service." Hall stated that "If a hotline was opened for

27   whistleblowers to turn in cheaters, it would be flooded because everybody knows who cheated."

28

403.     Not long after Hall was appointed to the UT System Board of Regents in 2011, he began leveling a series of complaints against then UT-Austin President Bill Powers — including a claim that Powers had helped well-connected applicants gain entrance to the university even if their academic credentials did not measure up.

404.     Moreover, in June 2014, a former UT Admissions Official alleged that the Office of the President had at times exerted pressure on the Admissions Office to admit some applicants of lesser qualifications in response to "external influences."

405.     In late June 2014, the President of UT advised the Chancellor that he faced "a lot of pressure" over the admissions process from donors, alumni, and legislators.

406.     In response to the controversy, the Chancellor decided that an independent review of the extent of undue influence over the admissions process was required.

407.     A report, commissioned by the University of Texas System, was prepared to address the issues of pay-to-play in the admissions process at UT-Austin.  The Report, dated February 6, 2015, is entitled, "*University of Texas-Austin—Investigation of Admissions Practices of Undue Influence, Summary of Key Findings, Final Report to the Office of the Chancellor of The University of Texas System*." (hereinafter "the 2015 Texas Report").

408.     The 2015 Texas Report was based upon the notion that attempts to unduly influence admissions are "inappropriate," and that "a student should not be advantaged or given special consideration as a result of his or her family's political or alumni connections or financial resources."

409.     The 2015 Texas Report found that the admission rate for those students with well-connected family members who sent recommendations directly to the President was an astounding 72%--a rate which was substantially higher than for the rest of the application population (40%). "The report found that disparities in admission rates could not reasonably be explained by factors of individual merit, such as grades, test scores, and other holistic considerations."

410.     The 2015 Texas Report concluded that for those applicants with influential family members who made direct recommendations to the President, "Admissions decisions were likely impacted in some cases by the letters of recommendation."

411.   The 2015 Texas Report found that the university had a longstanding practice of placing "holds" on the applications of certain students.  The "hold" barred the rejection of that applicant without notifying a dean or the President's office.

412.   A "Q" Hold meant that the application of the student was being monitored by the Office of the President; a "L" hold meant that the application was being monitored by one of the college Deans; a "B" hold meant that both the President's Office and a Dean were monitoring the application.  The Report showed that Q Holds were increasing in the years leading up to the Report.  Volumes of Q Holds were as high as 300 in a given year.

413.   The 2015 Texas Report noted that each year, President Powers admitted that he directed the admission of certain recommended individuals over the objections of the Admissions Office.

414.   The President admitted to investigators that "relational factors" occasionally play an important role in determinations to admit some applicants who might otherwise not have been admitted.  The Report concluded that "relationships matter and are the deciding factor in admissions decisions for a select handful of applicants each year."

415.   The 2015 Texas Report found that 73 enrolled applicants with "holds" were admitted despite an SAT score less than 1100 and a GPA of less than 2.9.   The average SAT for UT applicants in 2014 was 1901 out of 2400.

416.   In one case, the UT Admissions Director told the President's chief of staff, Nancy Brazzil, that there is "no way I can admit this student" given the applicant's record, but Brazzil replied, "Well, I speak for the president and he wants it done." The applicant was admitted.

417.   The 2015 Texas Report described the then-existing admission system at UT-Austin as "affirmative action for the advantaged."

418.   Despite purported reforms undertaken by the university in the wake of the 2015 Texas Report, the university still allowed the student listed above to be admitted in 2015 (the same year as the report) with a clear *quid pro quo* bribery payment to the UT tennis coach.

**CLASS ACTION AMENDED COMPLAINT**

419.    Center acted as a UT-Austin representative and agent, as he was vested with authority to make admissions decisions or with substantial influence over admissions decisions, thus causing the university to act unlawfully.

## IV.    ALLEGATIONS RELATING TO THE PLAINTIFFS

420.    Plaintiff Alyssa Tamboura is a student at the University of California, Santa Cruz. In 2018, Plaintiff Tamboura applied for undergraduate admission at Stanford University and was not accepted into the university. At the time of her application, Plaintiff Tamboura paid an admissions application fee of between $55 and $100 to Stanford. In connection with her application and payment of her application fee, Plaintiff Tamboura reasonably believed she would receive fair consideration and a fair merit-based application process, based on the same criteria applied to all other applicants. Plaintiff Tamboura asserts her claim against Stanford.

421.    Plaintiff Marine Hall-Poirier is a graduate of the University of Oregon. In 2014, Plaintiff Hall-Poirier applied to Georgetown for undergraduate admission and was not accepted into the university. At the time of her application, Plaintiff Hall-Poirier paid an admissions application fee of between $55 and $100 to Georgetown. In connection with her application and payment of her application fee, Plaintiff Hall-Poirier reasonably believed she would receive fair consideration and a fair merit-based application process, based on the same criteria applied to all other applicants. Plaintiff Hall-Poirier asserts her claim against Georgetown.

422.    Plaintiff Keith Hall is the parent of Plaintiff Hall-Poirier. Along with Plaintiff Hall-Poirier, Plaintiff Hall paid Georgetown an admissions application fee of between $55 and $100. Plaintiff Hall asserts his claim against Georgetown.

423.    Plaintiff Laurence Poirier is the parent of Plaintiff Hall-Poirier. Along with Plaintiff Hall-Poirier and Plaintiff Hall, Plaintiff Poirier paid Georgetown an admissions application fee of between $55 and $100. Plaintiff Poirier asserts her claim against Georgetown.

424.    Plaintiff Yasamin Ghodsbin is a graduate of the Loyola Marymount University. In 2014, Plaintiff Ghodsbin applied to USC for undergraduate admission and was not accepted into the university. Again in 2015, Plaintiff Ghodsbin applied to USC for undergraduate admission and was not accepted into the university. At the time of both of her applications, Plaintiff Ghodsbin paid USC

**CLASS ACTION AMENDED COMPLAINT**

1    an admissions application fee of between $55 and $100. In connection with her application and

2    payment of her application fees, Plaintiff Ghodsbin reasonably believed she would receive fair

3    consideration and a fair merit-based application process, based on the same criteria applied to all other

4    applicants. Plaintiff Ghodsbin asserts her claim against USC.

5    425.    Plaintiff Mika Tjoa is a student at the University of California, Berkeley. In 2016,

6    Plaintiff Mika applied for undergraduate admission at UCLA and USC. In 2017, Plaintiff Mika

7    applied for undergraduate admission at Stanford. Plaintiff Mika was denied acceptance to all of these

8    universities. At the time of her applications, Plaintiff Mika paid an admissions application fee of

9    between $55 and $100 to Stanford, UCLA and USC.  In connection with her application and payment

10   of her application fees, Plaintiff Mika reasonably believed she would receive fair consideration and a

11   fair merit-based application process, based on the same criteria applied to all other applicants. Plaintiff

12   Mika asserts her claim against Stanford, UCLA and USC.

13   426.    Plaintiff Candace Tjoa is the parent of Plaintiff Mika. Along with Plaintiff Mika,

14   Plaintiff Candace paid an admissions application fee of between $55 and $100 to Stanford, UCLA

15   and USC. Plaintiff Candace asserts her claim against Stanford, UCLA and USC.

16   427.    Plaintiff Timmy Mai is a student at San Jose State University in San Jose, California.

17   In 2017, Plaintiff Timmy applied for undergraduate admission at UCLA and Yale. Plaintiff Timmy

18   was denied admission at both universities. At the time of his application, Plaintiff Timmy paid an

19   admissions application fee of between $55 and $100 to UCLA and Yale University. In connection

20   with his application and payment of his application fees, Plaintiff Mai reasonably believed he would

21   receive fair consideration and a fair merit-based application process, based on the same criteria

22   applied to all other applicants. Plaintiff Mai asserts his claim against UCLA and Yale.

23   428.    Plaintiff Chrissy Pham is the parent of Plaintiff Mai. Along with Plaintiff Mai, Plaintiff

24   Pham paid UCLA and Yale an admissions application fee of between $55 and $100. Plaintiff Pham

25   asserts her claim against UCLA and Yale.

26   429.    Plaintiff Esteban Frausto is a student at the University of California Irvine. In 2016,

27   Plaintiff Frausto applied for undergraduate admission at USC. Plaintiff Frausto was denied admission

28   into the university. At the time of his application, Plaintiff Frausto paid an admission application fee

of between $55 and $100 to USC. In connection with his application and payment of his application fee, Plaintiff Frausto reasonably believed he would receive fair consideration and a fair merit-based application process, based on the same criteria applied to all other applicants. Plaintiff Frausto asserts his claim against USC.

430.    Plaintiff Karl Armbrust is a student at the University of Oregon in Eugene, Oregon. In 2016, Plaintiff Karl applied for undergraduate admission at UT-Austin. Plaintiff Karl was denied admission into the university. At the time of his application, Plaintiff Karl paid an admissions application fee of between $55 to $100 to UT-Austin. In connection with his application and application fee, Plaintiff Karl reasonably believed he would receive fair consideration and a fair merit-based application process, based on the same criteria applied to all other applicants. Plaintiff Karl asserts his claim against UT-Austin.

431.    Plaintiff Dirk Armbrust is the parent of Plaintiff Karl. Along with Plaintiff Karl, Plaintiff Dirk paid UT-Austin an admission application fee of between $55 and $100. Plaintiff Dirk asserts his claim against UT-Austin.

432.    Plaintiff Leilani Durden is a student at the University of California, Santa Barbara. In 2016, Plaintiff Leilani applied for undergraduate admission at UCLA and USC. Plaintiff Leilani was denied admissions both universities. At the time of her application, Plaintiff Leilani paid an admissions application fee of between $55 to $100 to UCLA and USC. In connection with her application and application fees, Plaintiff Leilani reasonably believed she would receive fair consideration and a fair merit-based application process, based on the same criteria applied to all other applicants. Plaintiff Leilani asserts her claim against UCLA, and USC.

433.    Plaintiff LaNae Durden is the parent of Plaintiff Leilani. Along with Plaintiff Leilani, Plaintiff LaNae paid UCLA and USC an admission application fee of between $55 and $100. Plaintiff LaNae asserts her claim against UCLA and USC.

434.    Plaintiff Jillian Garcia is attending college at the University of North Texas. In 2018, Plaintiff Jillian applied for undergraduate admission at UT-Austin and was not accepted into the university. At time of her application, Plaintiff Jillian paid an admissions application fee of between $55 to $100 to UT-Austin. In connection with her application and application fee, Plaintiff Jillian

1    reasonably believed she would receive fair consideration and a fair merit-based application process,

2    based on the same criteria applied to all other applicants. Plaintiff Jillian asserts her claim against UT-

3    Austin.

4         435.    Plaintiff Victor Garcia is the parent of Plaintiff Jillian. Along with Plaintiff Jillian,

5    Plaintiff Victor paid UT-Austin an admission application fee of between $55 and $100. Plaintiff

6    Victor asserts his claim against UT-Austin.

7         436.    Plaintiff Laila Keyhan is a student at the University of California, Los Angeles. In

8    2018, Plaintiff Laila applied for undergraduate admission at Stanford and Georgetown and was not

9    accepted into these universities. At the time of her application, Plaintiff Laila paid an admission

10   application fee of between $55 to $100 to Stanford and Georgetown. In connection with her

11   application and application fees, Plaintiff Laila reasonably believed she would receive fair

12   consideration and a fair merit-based application process, based on the same criteria applied to all other

13   applicants. Plaintiff Laila asserts her claim against Stanford and Georgetown.

14        437.    Plaintiff Kasra Keyhan is the father of Plaintiff Laila. Along with Plaintiff Laila,

15   Plaintiff Kasra paid Stanford and Georgetown an admission application fee of between $55 and $100.

16   Plaintiff Kasra asserts his claim against Stanford and Georgetown.

17        438.    Plaintiff Caleb Crane is a student at the University of Washington Tacoma. In 2018,

18   Plaintiff Crane applied for undergraduate admission at USC and was not accepted into the university.

19   At the time of his application, Plaintiff Crane paid an admission application fee of between $55 to

20   $100 to USC. In connection with his application and application fee, Plaintiff Crane reasonable

21   believed he would receive fair consideration and a fair merit-based application process, based on the

22   same criteria applied to all other applicants. Plaintiff Crane asserts his claim against USC.

23        439.    Plaintiff Falen Robinson is the parent of Plaintiff Crane. Along with Plaintiff Crane,

24   Plaintiff Robinson paid USC an admission application fee of between $55 and $100. Plaintiff

25   Robinson asserts her claim against USC.

26        440.    Plaintiff Cole Smith is a student at Steven's Technology Institute in Hoboken, New

27   Jersey. In 2017, Plaintiff Cole applied for undergraduate admission at Stanford and Wake Forest.

28   Plaintiff Cole was denied admission at both universities. At the time of his application, Plaintiff Cole

1   paid an admission application fee of between $55 to $100 to Stanford and Wake Forest.  In connection

2   with his application and application fees, Plaintiff Cole reasonably believed he would receive fair

3   consideration and a fair merit-based application process, based on the same criteria applied to all other

4   applicants. Plaintiff Cole asserts his claim against Stanford and Wake Forest.

5       441.   Plaintiff Ronda Smith is the parent of the Plaintiff Cole. Along with Plaintiff Cole,

6   Plaintiff Rhonda paid Stanford and Wake Forest an admission application fee of between $55 and

7   $100. Plaintiff Ronda asserts her claim against Stanford and Wake Forest.

8       442.   Plaintiff Kathleen Tatusko is a student at Clemson University in Clemson, South

9   Carolina. In 2017, Plaintiff Kathleen applied for undergraduate admission at Wake Forest and was

10  not accepted into the university. At the time of her application, Plaintiff Kathleen paid an admission

11  application fee of between $55 to $100 to Wake Forest. In connection with her application and

12  application fees, Plaintiff Kathleen reasonably believed she would receive fair consideration and a

13  fair merit-based application process, based on the same criteria applied to all other applicants. Plaintiff

14  Kathleen asserts her claim against Wake Forest.

15      443.   Plaintiff Amy Tatusko is the parent of Plaintiff Kathleen. Along with Plaintiff

16  Kathleen, Plaintiff Amy paid Wake Forest an admission application fee of between $55 and $100.

17  Plaintiff Amy asserts her claim against Wake Forest.

18      444.   Plaintiff Angelique Vollmer is a student at the University of Nevada Reno. In 2018,

19  Plaintiff Angelique applied for undergraduate admission at Stanford and USC and was denied

20  admission into both universities. At the time of her application, Plaintiff Angelique paid an

21  admissions application fee of between $55 and $100 to Stanford and USC.  In connection with her

22  application and application fees, Plaintiff Angelique reasonably believed she would receive fair

23  consideration and a fair merit-based application process, based on the same criteria applied to all other

24  applicants. Plaintiff Angelique asserts her claim against Stanford and USC.

25      445.   Plaintiff Michael Vollmer is the parent of Plaintiff Angelique. Along with Plaintiff

26  Angelique, Plaintiff Vollmer paid Stanford and USC an admission applications fee of between $55

27  and $100. Plaintiff Michael asserts his claim against Stanford and USC.

28

**CLASS ACTION AMENDED COMPLAINT**

446.     Plaintiffs will adequately represent the members of the Class, and their claims are typical of other Class Members.

## V.     CLASS ACTION ALLEGATIONS

447.     Plaintiffs bring this action on their own behalf and, pursuant to Federal Rule of Civil Procedure, 23(a), (b)(2), and (b)(3), on behalf of the following Class ("the Class").  The Class is initially defined as follows:

> **All individuals who, between 2012 and 2018, applied to UCLA, USC, Stanford University, U-Texas at Austin, Wake Forest University, Georgetown University, or Yale University, paid an undergraduate admission application fee to one or more of these universities, with respect to an undergraduate admission application that was rejected by the university.**

448.     Excluded from the Class are:

(a) any employees of Defendants, including any entity in which any of the Defendants has a controlling interest, is a parent or a subsidiary of, or which is controlled by any of the Defendants;

(b) the officers, directors, and legal representatives of Defendants; and

(c) the Judge and the court personnel in this case as well as any members of their immediate families.  Plaintiffs reserve the right to amend the definitions of the Class if discovery, further investigation and/or rulings by the Court dictate that they should be modified.

449.     *Numerosity. Fed. R. Civ. P. 23(a)(1).*  The members of the Class are so numerous that the joinder of all members of the Class in a single action is impractical.  While the exact number of Class Members is unknown to Plaintiffs at this time, Defendants have control over how many applicants have been denied in the past.  Given the number of applications on a daily basis, it stands to reason that the number of Class Members is at least in the thousands.

450.     According to data provided by the universities to a clearinghouse which provides information for inclusion in the *U.S. News & World Report* annual ranking of colleges and universities, called the "Common Data Set," shows the number of applicants to each university for

each year from 2015 to 2019; the number of students accepted; the number of students rejected; and the price of each application fee for each year.

451.   For example, USC had 51,924 applications in 2015-2016; 54,280 in 2016-2017; 56,676 in 2017-2018; and 64,352 in 2018-2019.  Of those applications, USC rejected 42,743 students in 2015-2016; 45,260 students in 2016-2017; 47,634 students in 2017-2018; and 56,013 students in 2018-2019.  Each of those students is a putative Class Member, provided he or she paid the application fee.  There would obviously be a small number of students who received fee waivers and paid no application fee.  However, the number of fee waivers will not be great.  One can see from the USC numbers alone that the number of Class Members will be in the tens of thousands at least, and probably in the hundreds of thousands.  Accordingly, the Numerosity requirement has been satisfied.

452.   *Commonality and Predominance.  Fed. R. Civ. P. 23(a)(2) and (b)(3).*  There are questions of law and fact common to the Class Members.  These common questions of law and fact include, without limitation:

      a.    did the universities know that this fraudulent scheme was being conducted and fail to take corrective action;

      b.    were the universities negligent in not discovering the fraudulent scheme of their employees;

      c.    should the university have engaged in closer monitoring of its employees and individuals involved with the admissions process;

      d.    what quality control standards were in place at the universities to ensure that this kind of conduct did not occur, and to ensure the fairness of the admissions process; and

      e.    what were the acts of the Defendants in furtherance of the fraudulent scheme;

      f.    did the Defendants or their representatives engage in unfair practices as defined by statute;

      g.    did the Defendants' or their representatives' actions cause the application process to not have been fair and based on the same objective criteria that should have been applied to all applicants equally;

h.    were Plaintiffs and putative class members harmed and did they suffer damages as a result of the bribery scheme.

453.    *Typicality. Fed. R. Civ. P. 23(a)(3).*    Plaintiffs' claims are typical of other Class Members because Plaintiffs' applications for admission did not benefit from a proper review due to the fraudulent process which was caused by the conduct of the Defendants.  Moreover, each of the Plaintiffs, like other Members of the Class, lost the amount of the application fee which they paid.

454.    *Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).*    Plaintiffs will fairly and adequately represent and protect the interests of the Class Members.  Plaintiffs have retained competent counsel experienced in litigation of class actions, including consumer class actions. Plaintiffs' claims are typical of the claims of other Class Members, and Plaintiffs have the same non-conflicting interests as the other Class Members.  Therefore, the interests of the Class Members will be fairly and adequately represented by Plaintiffs and their counsel.

455.    *Superiority of Class Action. Fed. R. Civ. P. 23(b)(3).*    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims.  There will be no difficulty in the management of this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to the parties and to the Court.  Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied.

456.    Class certification is also appropriate under *Fed. R. Civ. P. 23(a)* and *(b)(2)* because the Defendants have acted or refused to act on grounds generally applicable to the Class, such that final injunctive relief or corresponding declaratory relief is appropriate to the Class as a whole.

## VI.    CAUSATION, INJURY, AND DAMAGES

457.    By reason of the above-described conduct, Defendants caused actual harm, injury-in-fact, and loss of money to Plaintiffs and each member of the Class. Plaintiffs were injured in the following ways:

a.      Plaintiffs paid an application fee (typically $55 to $100 depending upon the school and year) for the purpose of being considered for admission as part of a fair process in which all applicants would be evaluated using the same set of criteria.  Plaintiffs also had to pay fees to the College Board (typically $11.25 per test), ACT, Inc. (typically $12.00 to $16.50 per test), or both, to forward their standardized test scores to those universities for consideration of their application.

b.      Plaintiffs did not receive fair consideration and a fair merit-based application process because other applicants were admitted based on different criteria, i.e., whether they were willing to pay bribes.

c.      If the admission consideration services sold by Defendants were based on the same criteria for all applicants, Plaintiffs would not have suffered the damage and economic loss described herein.

d.      The purported or necessarily and reasonably implied fairness of the admission consideration process was a material factor in attracting applicants to pay their fees and submit their application.

e.      Defendants have not reimbursed Plaintiffs or putative class members.

f.      Plaintiffs and members of the Class have been deprived of the amounts they paid for admission consideration sold to them by Defendants, requiring restitution.

g.      Plaintiffs and members of the Class have been deprived of the benefit of their bargains and suffered other damages by Defendants' sale of admission consideration.

h.      Plaintiffs and members of the Class have incurred economic losses as a result of Defendants' unfair or deceptive conduct.

**CLASS ACTION AMENDED COMPLAINT**

## VII.   LEGAL BASIS FOR RELIEF

## COUNT I

### Defendants Singer, The Key and KWF

### Civil RICO, 18 U.S.C. Sec. 1962(c), 1964 et al.

458.   Plaintiffs incorporate by reference all previous paragraphs as if more fully set forth herein.

459.   Together, The Key and KWF constituted an "enterprise" as defined by *18 U.S. C. Sec. 1961(4)* ("the Key Enterprise"), that is, an association, in fact, of entities engaged in, and the activities of which affected, interstate and foreign commerce ("the enterprise").  The Key Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

460.   In order to further the purposes of the Key Enterprise's conspiracy, Singer used The Key and KWF in an illegal manner and participated in numerous overt acts in furtherance of The Key Enterprise conspiracy.

461.   In furtherance of the illegal goals of the Key Enterprise, Singer conspired with certain University employees and certain parents of college students, to violate *18 USC Sec. 1962(c)*, that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in *18 USC Secs. 1961, 1962,* and *1964*, consisting of multiple illegal acts under:

a.   *18 USC Sec. 1341* (relating to mail fraud);

b.   *18 USC Secs. 1341 and 1346* (relating to honest services mail fraud);

c.   *18 USC Sec. 1343* (relating to wire fraud);

d.   *18 USC Secs. 1343 and 1346* (relating to honest services wire fraud); and

e.   *18 USC Sec. 1956(a)(l)(B)(i)* (relating to the laundering of monetary instruments). Singer used a charitable organization to fraudulently obtain tax-exempt status, while simultaneously abetting the parents in violating tax laws by claiming "donations" to KWF as charitable donations.

462.     Singer himself has been indicted under the criminal version of RICO in the United States District Court for the District of Massachusetts.

463.     Each of the Plaintiffs herein, and all Class Members, have standing to bring a claim under civil RICO because each of them has suffered a concrete and distinct injury—at a minimum, the payment of an application fee to one or more of these eight universities—which they paid under the assumption that the college application process at these universities was fair and impartial.

464.     Neither students nor their parents have unlimited funds to pay for application fees. They must pick and choose which university or universities to apply to, based upon their available funding, the cost of the application fee, and the likelihood that they will be accepted pursuant to the objective criteria of each university.  Applicants had a right to know that their application was going to be part of a review process corrupted by rampant fraud and back-door bribery.

465.     The illegal acts in furtherance of the enterprise by Defendants Singer, The Key and KWF proximately caused damage to the Plaintiffs and the Class Members.

466.     Accordingly, Plaintiffs, on behalf of themselves and the Class Members, bring this Count I under *18 U.S.C. Sec. 1964(c)*.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count I of the Complaint against Defendants Singer, The Key, an KWF, for compensatory damages in an amount which is fair and reasonable to compensate the Class members for their damages, including but not limited to the recoupment of all admission fees paid to said universities during the applicable statute of limitations period, claw-back of all illegal fees paid by bribing parents to Singer, The Key and/or KWF, for treble damages, costs of suit, and reasonable attorneys' fees.

## COUNT II

### University Defendants

### California Consumers Legal Remedies Act: *Civil Code Secs. 1750 - 1784*

467.     Plaintiffs incorporate by reference all previous paragraphs as if more fully set forth herein.

468.     *The California Consumers Legal Remedies Act ("CLRA"), provides in Cal. Civil Code 1770(a)(5)* that it is a deceptive trade practice for a seller of goods or services to represent that

*"...**goods or services have** sponsorship, approval, **characteristics**, ingredients, uses, **benefits**, or quantities **that they do not have** or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have."* (Emphasis added.)

469.  Each of the eight universities have advertised that their college admissions process is fair and unbiased and based upon the applicant's merit:

(a)  Yale University's website boasts:

*Our difficult - yet fascinating and rewarding - job is to select that class. How do we do it?*

*An applicant's academic strength is our first consideration. We review grades, standardized test scores, and evaluations by a counselor and two teachers to determine academic strength. The Admissions Committee then factors in student qualities such as motivation, curiosity, energy, leadership ability, and distinctive talents.*

*Ultimately, our goal is to build an extraordinary class of students. If you want to be a part of it, we welcome your application. To get started, please follow the links to the right.*

(b)  Stanford University also states that admission is based upon such items as the high school transcript, test scores, extracurricular activities, intellectual vitality, and other factors:

*The primary criterion for admission to Stanford is academic excellence. We look for your preparation and potential to succeed. We expect you to challenge yourself throughout high school and to do very well. The most important credential that enables us to evaluate your academic record is the high school transcript. Remember, however, that our evaluation goes beyond any numerical formula. There is no minimum GPA or test score; nor is there any specific number of AP or honors courses you must have on your transcript in order to be admitted to Stanford.*

(c)  Georgetown University makes similar claims on its website:

*Georgetown maintains a holistic review process with a focus on success in your high school curriculum as the foundation of a competitive application.*

(d)  UCLA also claims that admissions are based upon student merit, and boasts that it has high "quality control" to make the admissions system reliable:

*Each year, UCLA considers many more excellent applicants for freshmen admission than it can possibly admit. The goal of the campus' admissions*

*review process is to single out from a large and growing pool of academically strong applicants those unique individuals who have demonstrated the intellectual curiosity, tenacity, and commitment to community service expected of the UCLA graduate. These select applicants are the ones who would contribute the most to UCLA's dynamic learning environment; they are also the applicants who would make the most of being immersed in it. Although high school grade point average and standardized test scores are important indicators of academic achievement used in UCLA's admissions review, they only tell part of the story.*

\* \* \*

*Selection is based on a comprehensive review of all information—both academic and personal—presented in the application. All applications are read twice, in their entirety, by professionally trained readers. After independently reading and analyzing a file, the reader determines a comprehensive score that is the basis upon which the student is ultimately admitted or denied. In addition, admissions managers conduct multiple checks for consistency and completeness throughout the reading process. While this evaluation process is based on human judgments rather than a system that quantifies factors and incorporates them into a numerical formula, the extensive reader training, comprehensive reading of files, as well as other monitoring procedures, **ensure that the process is highly reliable. Formal tests of reliability are conducted regularly to assure quality control**.*
*(emphasis added)*

(e)      USC also makes similar claims that its admission process is based upon student

merit:

*Like many highly selective universities, we conduct a comprehensive, holistic review of your application to consider academic and personal characteristics. We will review your performance in school, the rigor of your program, writing skills and test scores. We also consider personal qualities, as revealed in community involvement, leadership and achievements.*

(f)      Wake Forest makes similar claims on its website:

*Candidates for admission must furnish evidence of maturity and educational achievement, plus evidence of character and motivation for study in the College of Arts and Sciences.  High school curriculum and classroom performance, combined with the student's writing ability, extracurricular activities, and evidence of character and talent, are the most important criteria for admission.*

**CLASS ACTION AMENDED COMPLAINT**

(g)     University of Texas at Austin also promises a "holistic review" of the application based upon the student's merit:

> *All applications receive an individualized holistic review as part of the UT Austin admissions decision review process.*

The university even went so far as to eschew the influence of money in the admissions process:

> *The suspicion of a double standard that favors well-connected students is not new, particularly for more selective institutions.* ***Ensuring that fair and transparent admissions processes exist across the U. T. System is necessary to maintain public trust.*** *Recruitment and admissions policies that are disclosed to the public and are consistent with stated university goals garners public trust that student admissions are* ***centered on merit****. The integrity of the admissions processes at each of the University of Texas institutions depends upon the unbiased determination of the appropriate* ***merits of each applicant****.* ***Attempts to influence those processes by use of a person's community stature, promise of financial donation (or threat to discontinue financial donation) or any other means that do not directly address the merits of the applicant are inappropriate*** *and not consistent with the status of the university as a public institution of the state of Texas.*

Each of the university websites have made similar claims throughout the Class period that admissions are solely based upon each applicant's merit.

470.    These representations, it has now come to be learned, were false, and the statements about the university represented goods and services which had characteristics which they did not have.  In fact, as has been shown above, each of the admissions processes at these universities was tainted by corruption, such that those parents with children who had mediocre grades and test scores were allowed admission based upon the amount of bribery money they paid university insiders.

471.    Each of the universities made similar statements on their websites from 2012 to 2018 representing that their admissions process was essentially merit-based, and nowhere on those websites did the universities ever disclose that students were being admitted based upon bribery payments made to the universities or university officials. The misrepresentations by the universities as to their merit-based admissions process, and their failure to disclose the true nature of the admissions process, were part of an extensive and long-term advertising campaign by each of the universities.

472. *Cal Civ. Code. Sec. 1780* provides that if the Defendant engages in a practice declared deceptive under the Act, the Plaintiff may file a complaint either alone or as a class action (see Sec. 1781) a civil action for damages:

    a. *Any consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by* Section 1770 *may bring an action against that person to recover or obtain any of the following:*

        *(1) Actual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000).*

        *(2) An order enjoining the methods, acts, or practices.*

        *(3) Restitution of property.*

        *(4) Punitive damages.*

        *(5) Any other relief that the court deems proper. Subsection (e)* also allows the prevailing plaintiff to recover costs and attorneys' fees.

A. *Subsection (d)* provides that an action under this Section may be brought in the county in which the person against whom it is brought resides, has his or her principal place of business, or is doing business, or in the county where the transaction or any substantial portion thereof occurred. Plaintiffs attach hereto a Declaration pursuant to *Sec. 1780(d)* stating that venue in this District is appropriate.

B. Each of the Class Members was a consumer, and the University Defendant's actions were made in connection with goods and services for personal, family, and/or household uses.

473. As a direct and proximate result of the deceptive practices of the university Defendants, each of the Plaintiffs, and all of the Class Members were damaged, in that they paid admission application fees and other fees based upon the representations of these Defendant Universities that the application process was fair, neutral, and based upon the applicant's merit.

474. In addition, the University Defendants' deceptive material omissions stand as violations of the CLRA.

**CLASS ACTION AMENDED COMPLAINT**

475.    Each of the representations by the University Defendants on their respective websites as to the integrity of the admissions process was material, and most reasonable student applicants and their parents would attach importance to the existence or non-existence of the integrity of the admissions process.   It would have been material for each member to the Class, when deciding whether to apply to the university and pay the application fee, to know whether students were being admitted through "side door" bribery schemes, and all members of the Class would deem it important to know of such bribery schemes.  Each of the named Class representatives, and each Member of the Class, reasonably and justifiably relied upon the integrity of the admissions process as represented by the Universities.  With respect to the named Plaintiffs, the failure to advise them of the bribery scheme and the misrepresentation of the admissions process as merit-based were substantial factors influencing their decisions to apply to those universities and pay application fees.

476.    The actions of the University Defendants warrant appropriate injunctive relief and the imposition of punitive damages in addition to compensatory damages.

WHEREFORE, Plaintiffs pray for Judgment on Count II against the University Defendants for compensatory damages in an amount which is fair and reasonable, for punitive damages in an amount sufficient to deter future misconduct, for court costs, reasonable attorney's fees, injunctive relief, and such other relief as the Court deems just and proper.

## COUNT III

### University Defendants

California Unfair Competition Law, *Cal. Bus. and Prof. Code Secs*. 17200 – 17209

477.    Plaintiffs incorporate by reference all previous paragraphs as if more fully set forth herein. The California Unfair Competition Law ("UCL:") defines "unfair competition" as any of the following wrongs: (1) an "unlawful" business act or practice; (2) an "unfair" business act or practice; (3) a "fraudulent" business act or practice; (4) "unfair, deceptive, untrue or misleading advertising"; and (5) any act prohibited by Sections 17500 through 17577.5.  These definitions are disjunctive, and each of the wrongs operates independently from the others.  "In other words, a practice is prohibited as 'unfair' or ['fraudulent'] even if not 'unlawful' and vice versa."

478.    Each of the University Defendants represented multiple times on its websites that its college admission process would be based upon the individual's test scores, grades, activities and other items of merit, as opposed to the bribe money, and lack thereof, that could be paid to university insiders. Each of the universities made similar statements on their websites from 2012 to 2018 representing that their admissions process was essentially merit-based, and nowhere on those websites did the universities ever disclose that students were being admitted based upon bribery payments made to the universities or university officials.

479.    The University Defendants knew or should have known of these corrupt practices because : (1) the funds were often going into University accounts, and to prominent University figures such as coaches and directors in charge of University accounts; (2) students supposedly admitted as star athletes ended up never playing on the university team for the sport at which the student supposedly excelled; (3) at least with respect to some of the University Defendants, there were patterns of payments, in which the parents would make payments to the University or university officials directly after conditional acceptance letters, often in the same amounts; and the Singer entities would often make payments to the University or its officials directly after final acceptance, often in the same amounts; (4) at least with respect to some University Defendants, high school college guidance counselors contacted the university and expressed skepticism that their student was really qualified as a star athlete in a particular sport; (5) at least with respect to some University Defendants, Photoshopped photos of the student accompanied applications; (6) the applications did not come accompanied with testimonials from high school coaches, sports recruiters, or other persons with knowledge of the applicant's athletic prowess.

480.    Representing to students that the application process is based on merit, while simultaneously turning a blind eye to rampant bribery going on with the university's employees, constitutes a violation of the UCL, and constitutes: an "unlawful" business act and practice; "unfair" business acts and practices;" fraudulent business acts and practices; and "unfair, deceptive, untrue, and misleading advertising."

481.   Moreover, the failure of these Universities to have audits and other quality control mechanisms in place to ensure that this type of behavior did not occur is, in itself, an unfair business practice.

482.   Each of the University Defendants engaged in "business practices" relating to its admission process and the quality control thereof.  Obtaining students' tuition and fees for educational services and admission services is a big business for Defendants.

483.   Each of the Plaintiffs and the Members of the Class have suffered an economic injury in fact and have lost money or property as a proximate result of the unfair competition of the Defendant Universities—namely, at the very minimum, the application fees paid to the universities for admission.  The Class Members also lost the money paid to the College Board and ACT, Inc. to forward their test scores to the universities as part of the application process.

484.   Class Members were unaware of the material fact that the University Defendants' were admitting students based upon bribery payments made the students' parents to the universities or university officials, and each of the Class Members lost money as a result.

485.   Each of the representations by the University Defendants on their respective websites as to the integrity of the admissions process was material, and most reasonable student applicants and their parents would attach importance to the existence or non-existence of the integrity of the admissions process.  It would have been material for each member to the Class, when deciding whether to apply to the university and pay the application fee, to know whether students were being admitted through "side door" bribery schemes, and all members of the Class would deem it important to know of such bribery schemes.  Each of the named Class representatives, and each Member of the Class, reasonably and justifiably relied upon the integrity of the admissions process as represented by the Universities.  With respect to the named Plaintiffs, the failure to advise them of the bribery scheme and the misrepresentation of the admissions process as merit-based were substantial factors influencing their decisions to apply to those universities and pay application fees.

486.   The misrepresentations by the University Defendants on their websites about the application acceptance decision being based upon student merit was material.  A misrepresentation is material if a reasonable person would attach importance to its existence or nonexistence in

1    determining his choice of action in the transaction in question.  Obviously, whether college officials

2    accept bribes from prospective students' parents would be an objectively material factor to know

3    before deciding whether to apply to a school.

4         487.    Persons at each of the universities accepting bribes acted as university representatives,

5    as they were vested with authority to make admissions decisions or with substantial influence over

6    admissions decisions, thus causing the universities themselves to act unlawfully.

7         488.    The Plaintiffs are entitled to full restitution of the amounts paid by Plaintiffs to

8    Defendants for admissions application fees during the relevant statute of limitations period.

9         WHEREFORE, Plaintiffs prays for judgment in Plaintiffs' favor against the University

10   Defendants on Count III, for equitable relief against the University Defendants, including restitution

11   of all moneys paid to Defendants as application fees during the relevant statute of limitations period,

12   for a reasonable attorney's fee as a "private attorney general" pursuant to *Code of Civil Procedure*

13   *Section 1021.5,* for court costs, and such other relief as the Court deems just and proper.

14                                        **COUNT IV**

15                                  **University Defendants**

16   **Negligent Failure to Monitor the Admissions Process and Ensure its Integrity**

17        489.    Plaintiffs incorporate by reference all previous paragraphs as if more fully set forth

18   herein.

19        490.    The University Defendants had a duty to potential applicants such as the Plaintiffs and

20   the Class Members to ensure that its college application process was performed fairly, honestly, and

21   without corruption or bribery; and that students were only allowed to the university based upon their

22   merit.

23        491.    The University Defendants could have ensured the integrity of that process by

24   conducting regular audits, instituting security procedures, monitoring its coaches and employees

25   vested with admissions authority or with substantial influence over admission decisions, having

26   additional layers of review of athletic applicants, checking athletic credentials and photographs, and

27   other safeguarding procedures. The University also could have had a process to ensure that students

28

1  admitted based upon athletic credentials actually joined the team of the sport in which they supposedly
2  excelled, and to give scrutiny to any admitted student who failed to appear for practice for that sport.

3  492.   This type of review process does not take long.  In fact, on March 26, 2019, less than
4  two weeks after the college bribery scandal was announced, Yale University President Peter Salovey,
5  in a letter to Yale supporters, announced that Yale had "confirmed the pre-admission athletic
6  credentials dating to 2015 of all members of the school's athletic teams who received an athletic
7  endorsement during the admission process."

8  493.   Each of the Defendant Universities breached their duty of oversight and failed to
9  exercise ordinary care that a reasonably prudent person would exercise in handling the function of
10  college admissions, and were negligent and careless in the following respects:

11  (a)   giving free reign to athletic coaches and directors to fill athletic slots however
12         they wanted to with inadequate oversight;

13  (b)   failing to conduct regular audits of university accounts and failure to recognize
14         suspicious patterns of payments;

15  (c)   failing to observe fraudulent sources of funds coming into university accounts
16         controlled by the coaches, athletic directors and other university employees;

17  (d)   allowing coaches and employees to remain in charge of university funds and
18         admission practices after it was known or suspected that they were engaging
19         in fraudulent activity;

20  (e)   failing to have an additional layer of review for athletic applications;

21  (f)   failing to check athletic credentials;

22  (g)   failing to observe that "action photos" of students were Photoshopped or were
23         of completely different individuals;

24  (h)   failing to take notice and engage in heightened scrutiny when high school
25         counselors called the university to question the credentials of their own
26         students;

27  (i)   failing to check to make sure that students who were admitted based upon
28         athletics went to athletic orientations and showed up for practice; and

1    (j)    failing to institute better quality controls.

2    494.    As a direct and proximate result of the negligence of the University Defendants,

3    Plaintiffs and the Class Members were damaged, in that they paid admission application fees to the

4    Defendants, as well as fees paid to the College Board and/or ACT, Inc. for forwarding test scores, but

5    did not receive a fair application process that a reasonable person would expect.

6    WHEREFORE, Plaintiffs pray for judgment in their favor on Count IV, for compensatory

7    damages in an amount which is fair and reasonable to compensate the Plaintiffs and the Class

8    Members, for court costs, and for such other relief as the Court deems just and proper.

9    **COUNT V**

10    **University Defendants**

11    **Respondeat Superior Based on Bribery**

12    495.    Plaintiffs incorporate by reference all previous paragraphs as if more fully set forth

13    herein.

14    496.    The employees of the University Defendants accepted bribe payments from the Key

15    Enterprise in exchange for classifying students as recruited athletes, thereby facilitating the students'

16    admission into these highly selective universities.

17    497.    The employees of University Defendants committed bribery by accepting payments

18    to secure admission into universities for students whose parents were willing to pay said bribes within

19    the time and space limits of their employment with the University Defendants. That is, these

20    employees accepted the bribes while they were working on campuses and with systems belonging to

21    the University Defendants. Further, these employees accepted the bribes by directing bribe money

22    into the athletic accounts at their respective universities and by using those university athletic

23    accounts to fund the university athletic programs, or by directing the bribe money into their own bank

24    accounts.

25    498.    The employees of the University Defendants committed bribery simply by performing

26    their job duties. The employees of the University Defendants were allocated a certain number of

27    admission slots for athletes. These employees were tasked with recruiting athletes for their respective

28    universities. The activities that led to the bribery were of a kind that the employees were hired by the

University Defendants to perform. That is, each employee used his or her position with the University Defendants to perpetuate the Student Athlete Recruitment scam by committing the predicate acts under the auspices of their usual job responsibilities. None of the University Defendants' employees would be able to perpetuate the Student Athlete Recruitment scam without the authority vested in them through their positions with the University Defendants.

499.    As the employers, the University Defendants supplied their employees with the means to perpetuate the Student Athlete Recruitment scam. These University Defendants could have stopped their employees from accepting bribes but failed to do so.

500.    Accordingly, the University Defendants are vicariously liable in respondeat superior for the actions of their employees in accepting bribes while participating in the approval and rejection of student applications to the universities.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count VI, for compensatory damages in an amount which is fair and reasonable to compensate the Plaintiffs and the Class Members for courts costs, and for such other relief as the Court deems just and proper.

## COUNT VI

### University Defendants

### Negligent Supervision of University Officials and Employees

501.    Plaintiffs incorporate by reference all previous paragraphs as if more fully set forth herein.

502.    By virtue of Plaintiffs relationship with University Defendants, and the University Defendants relation to its employees implicated in the Student Athlete Recruitment scam, the University Defendants owed Plaintiffs a duty to ensure that they received a fair and merit-based admission application process. This duty includes the proper supervision of its employees to ensure that the admission application process is not disrupted or influenced by bribes or corruption.

503.    University Defendants violated its duty to Plaintiffs since its admission process was tainted with bribery and corruption as result of University Defendants employees' actions. The University Defendants failed to preserve the integrity of the admission application process by conducting regular audits, security procedures, and monitoring of its employees. At no time during

1   the periods of Plaintiffs and Class Members application process did University Defendants have a

2   reasonable system or procedure to supervise and monitor its employees.

3       504.    University Defendants' conduct was a breach of their duties to Plaintiffs and Class

4   Members.

5       505.    As a direct and proximate result of the negligent supervision of University officials

6   and employees by the University Defendants, Plaintiffs and the Class Members were damaged, in

7   that they paid admission application fees to the University Defendants to participate in a fair merit-

8   based admission application process, which they did not receive. They also lost the fees paid to the

9   College Board and ACT, Inc. for forwarding their test scores.

10      WHEREFORE, Plaintiffs pray for judgment in their favor on Count VI, for compensatory

11  damages in an amount which is fair and reasonable to compensate the Plaintiffs and the Class

12  Members for courts costs, and for such other relief as the Court deems just and proper.

13                                  **COUNT VII**

14                              **University Defendants**

15      **Alternative Count to CLRA and UCL Counts--Negligent Misrepresentation and**
                                **Omission/Concealment**
16

17      506.    Plaintiffs incorporate by reference all previous paragraphs as if more fully set forth

18  herein.

19      507.    Each of the Defendants, through statements on their respective websites previously

20  quoted infra, and other similar statements on their websites in the past between 2012 and 2018,

21  represented that their admissions process would be based upon each applicant's merit, as opposed to

22  how much bribe money could be paid by the applicant's parents, and represented that said fact was

23  true.

24      508.    The Defendants' representations were not true, in that the admissions process was

25  corrupted by university officials accepting bribes to get unqualified applicants admitted.

26      509.    In the alternative to the allegations in Counts II and III that Defendants knew or should

27  have known that their representations were false, in the event that Defendants honestly believed that

28  their representations (that the application process would be based upon merit only) were true;

Defendants nevertheless made said representations negligently, and had no reasonable grounds to believe that the representations were true when they made them.

510.   The Defendants intended that their undergraduate applicants would rely on their representations.

511.   Each of the Plaintiffs and the members of the Class reasonably and justifiably relied on the Defendants' representations and reasonably believed that no students were being admitted to the universities through side-door bribes to university officials.

512.   Plaintiffs were harmed by the misrepresentations, in that they paid application fees to the universities and paid fees to the College Board and ACT, Inc. to forward their test scores to the universities.

513.   The representation by the University Defendants of their admissions process being fair and merit-based (as opposed to a system which allowed the entry of applicants based upon fraud and bribery) was a substantial factor in influencing the Plaintiffs to apply to the universities.  The Plaintiffs were justified and reasonable in relying on the representations of the universities.

514.   The University Defendants' partial representations as to the nature of the admissions process on their website were misleading because other material facts (namely that the process was corrupted by bribery) was not disclosed.

515.   The University Defendants had superior and exclusive knowledge as to the methods by which the Universities admitted students, and therefore the Class Members could have no possible way of knowing that this bribery was occurring, thereby making it even more incumbent upon the Defendants to disclose these material facts.

516.   The Plaintiffs' reliance upon the Defendants' misrepresentations that admissions decisions were solely based upon the applicant's merit, and their material omissions of pertinent facts about the true nature of the admissions process, were was a substantial factors in causing the Plaintiffs' and the Class Members' harm and losses.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count V, for compensatory damages in an amount which is fair and reasonable to compensate the Plaintiffs and the Class Members, for court costs, and for such other relief as the Court deems just and proper.

**COUNT IX**

**University Defendants**

**Unjust Enrichment**

517.    Plaintiffs incorporate by reference all previous paragraphs as if more fully set forth herein.

518.    Defendants enriched themselves by collecting applicant fees from applicants who, having no knowledge of the Defendants' bribery schemes, willingly paid application fees between $55 and $100 to Defendants.

519.    The Defendants' wrongful, negligent and fraudulent conduct, as referenced *supra*, caused the Defendants to become unjustly enriched and receive benefits that otherwise would not have been achieved.

520.    Had the Defendants not engaged in the wrongful conduct, they would not have received the application fees of the Plaintiffs and Class Members.

521.    In equity and fairness, the Defendants must return the application fees spent to the Plaintiffs and Class Members.

WHEREFORE, Plaintiffs pray for judgment in their favor on Count VII, for compensatory damages in an amount which is fair and reasonable to compensate the Plaintiffs and the Class Members, for court costs, and for such other relief as the Court deems just and proper.

**COUNT X**

**Consumer Protection—Other States' Laws**

522.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

523.    All Plaintiffs and putative Class members assert consumer protection claims arising from the factual circumstances detailed above. All U.S. jurisdictions have enacted statutes designed to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising that further allow consumers to bring private or class actions. Consumer protection is a defined area of law, similar to negligence, contract, and warranty law.

524.    By the early 1980s, every state and the District of Columbia had enacted consumer protection legislation, based upon model acts promulgated by the Federal Trade Commission ("FTC")

and the National Conference of Commissioners on Uniform State Laws ("Uniform State Law Commission") – originally referred to as "little" or "baby FTC acts."  These remedial statutes, now generally known as "UDAP" (unfair or deceptive acts or practices) statutes, broadly prohibit unfair or deceptive acts and practices that harm consumers. They outlaw deceptive and abusive marketing and advertising misconduct and provide private, state enforcement mechanisms to supplement the limited resources of federal authorities.

525.    Virtually every UDAP law in the nation traces its origin to the FTC Act, 15 U.S.C. § 45(a)-(m), or one of two contemporaneous model consumer acts that were developed and promulgated in the 1960s and recommended for adoption in 1970 by The Council of State Governments.  All three models prohibit deceptive acts and practices aimed at consumers, including those at issue here.

> **Model Form 1** reads: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."
>
> **Model Form 2** reads: "False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."
>
> **Model Form 3** reads in pertinent part: "The following unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful:
> "(5)    representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;
> "(7)    representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; or
> "(9)    advertising goods or services with intent not to sell them as advertised[.]"

526.    **California's UCL**, a hybrid of Models 1 and 2, prohibits "unfair competition, [which] shall mean and include any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . .."  Cal. Bus. & Prof. Code § 17200.

527.    **California's CLRA** follows Model 3: "(a) The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

"(5)     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have.

"(7)     Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

"(9) Advertising goods or services with intent not to sell them as advertised."

Cal. Civ. Code § 1770.

528.     While State consumer protection laws may vary facially, their substance is strikingly similar and without material difference in this case. Not a single jurisdiction permits the misconduct and deception evidenced by Defendants' failure to provide the fair and unbiased application process Plaintiffs and Class members reasonably expected.

529.     Because the following state law standards are common and present no true conflicts of substantive law in the context of this case's facts, and in the alternative to applying the law of a single state to all Class Members, Plaintiffs seek, pursuant to Rule 23, to represent all people similarly injured under state consumer protection laws.

530.     Plaintiffs and each of the other members of the class is a consumer, purchaser, or other person entitled to the protection of the consumer protection laws of the state in which they reside or where a Defendant resides.

531.     The consumer protection laws of each state declare that unfair or deceptive acts or practices in the conduct of trade or commerce is unlawful.  Defendants have violated the consumer protection laws of all states in the same manner as described in Counts II and III.

532.     These consumer protection laws are substantively the same for purposes of defining Defendants' acts as violations thereof in this case:

**Alabama**:

Similar to California's CLRA and Model Form 3, Alabama law prohibits "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have … (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another … (27) Engaging

in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

Ala. Code § 8-19-5(5); (7); (27) (*cf.* Model Form 3; CLRA)

**Alaska**:

Similar to California's UCL and Model Forms 1 and 2, Alaska law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce… includ[ing], but not limited to … using or employing deceptive, fraud, false pretenses, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or mission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged."

Alaska Stat. §§ 45.50.471(a), (b) (*cf.* Model Forms 1 and 2; UCL)

**Arizona**:

Similar to California's UCL and Model Forms 1 and 2, Arizona law prohibits "The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise[.]"

Ariz. Rev. Stat. Ann. § 44-1522 (*cf.* Model Forms 1 and 2; UCL)

**Arkansas**:

Similar to California's UCL and Model Form 2, Arkansas law prohibits, "When utilized in connection with the sale or advertisement of any goods, services, or charitable solicitation, … The act, use, or employment by any person of any deception, fraud, or false pretense."

Ark. Code Ann. § 4-88-108 (*cf.* Model Form 2; UCL)

And similar to California's CLRA and Model Form 3, Arkansas law prohibits "(1) Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model … (10) Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]"

Ark. Code Ann. § 4-88-107(a)(1); (10) (*cf.* Model Form 3; CLRA)

**Colorado**:

Similar to California's CLRA and Model Form 3, Colorado law prohibits "(e) Knowingly mak[ing] a false representation as to the characteristics, ingredients, uses,

benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith … (g) Represent[ing] that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another[.]"

Colo. Rev. Stat. Ann. § 6-1-105(e); (g) (*cf*. Model Form 3; CLRA)

**Connecticut**:

Similar to California's UCL and Model Form 1, Connecticut law prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Conn. Gen. State. Ann. § 42-110b (*cf*. Model Form 1; UCL)

**Delaware**:

Similar to California's UCL and Model Forms 1 and 2, Delaware law specifies that "[t]he act, use or employment by any person of any deception, fraud, false pretenses, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intention that other rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice."

6 Del. Code § 2513(a) (*cf*. Model Forms 1 and 2; UCL)

**District of Columbia**:

Similar to California's CLRA and Model Form 3, District of Columbia law prohibits familiarly enumerated deceptive trade practices:  "It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to: (a) representing that goods or services have source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; … (d) represent that goods or services are of a particular standard, quality, grade, style, or model, if in fact they are of another; (e) misrepresent as to a material fact which has a tendency to mislead; … (h) advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered. . . ."

D.C. Code § 28-3904(e), (f) (*cf*. Model Form 3; CLRA)

**Florida**:

Similar to California's UCL and Model Form 1, Florida law prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive practices in the conduct of any trade or commerce[.]"

Fla. Stat. § 501.204(1) (*cf*. Model Form 1; UCL)

**Georgia**:

Similar to California's UCL and Model Form 1, Georgia law prohibits "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce."

Ga. Code Ann. § 10-1-370: § 10-1-393(a)(*cf.* Model Form 1: UCL)

**Hawaii**:

Similar to California's UCL and Model Form 1, Hawaii law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Haw. Rev. Stat. §§ 480-2(a) (*cf.* Model Form 1; UCL)

**Idaho**:

Similar to California's UCL and Model Forms 1 and 2, Idaho law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce… includ[ing], but not limited to … engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer."

Idaho Code § 48-603(5), (7), (17) & (18) (*cf.* Model Forms 1 and 2; UCL)

**Illinois**:

Similar to California's UCL and Model Forms 1 and 2, Illinois law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, [or] misrepresentation[.]"

815 ILCS 505/2 (*cf.* Model Forms 1 and 2; UCL);

And similar to California's CLRA and Model form 3, Illinois law also prohibits familiarly enumerated deceptive trade practices: "(a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: . . . (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; . . . (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (9) advertises goods or services with intent not to sell them as advertised[.]"

815 Ill. Comp. Stat. 510/2 (*cf.* Model form 3; CLRA)

**CLASS ACTION AMENDED COMPLAINT**

**Indiana**:

Similar to California's UCL and Model Form 1, Indiana law prohibits a supplier from committing an "unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction.".

Ind. Code § 24-5-0.5-3(a) (*cf*. Model Form 1; UCL)

And similar to California's CLRA and Model Form 3, Indiana law also prohibits the following representations as deceptive trade practices: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have. (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not… (7) That the supplier has a sponsorship, approval, or affiliation in such consumer transaction the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have."

Ind. Code § 24-5-0.5-3(b)(1),(b)(2), (b)(7) (*cf*. Model Form 3; CLRA)

**Iowa**:

Similar to California's UCL and Model Forms 1 and 2, Iowa law prohibits: "a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes."

Iowa Code § 714H (*cf*. Model Forms 1 and 2; UCL)

**Kansas**:

Similar to California's UCL and Model Form 2, Kansas law prohibits a supplier from engaging in "any deceptive act or practice in connection with a consumer transaction."

Kan. Stat. Ann. § 50-626(a) (*cf*. Model Form 2; UCL)

Also similar to California's CLRA and Model Form 3, Kansas defines "deceptive acts and practices" to include representations that: "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;…(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;… (F) property or services has uses, benefits or characteristics unless the supplier relied upon and possesses a reasonable basis for making such representation; or (G) use, benefit or characteristic of property or services has been proven or otherwise substantiated unless the supplier relied upon and possesses the type and amount of proof or substantiation represented to exist." Kansas law further

**CLASS ACTION AMENDED COMPLAINT**

proscribes: "(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact."

Kan. Stat. Ann. § 626(b)(1)(A), (D), (F), (G), § 626(b)(2), § 626(b)(3) (*cf.* Model Form 3; CLRA)

**Kentucky**:

Similar to California's UCL and Model Forms 1 and 2, Kentucky law prohibits

"[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce…."

Ky. Rev. Stat. § 367.170 (*cf.* Model Forms 1 and 2; UCL)

**Louisiana**:

Similar to California's UCL and Model Form 1, Louisiana law declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."

La. Stat. § 51:1405 (*cf.* Model Form 1; UCL)

**Maine**:

Similar to California's UCL and Model Form 1, Maine law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."

Me. Rev. Stat. Ann. tit.5, § 207 (*cf.* Model Form 1; UCL)

**Maryland**:

Similar to California's CLRA and Model Form 3, Maryland law prohibits the familiarly enumerated "unfair, abusive, or deceptive trade practices" to include any (1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; (2)Representation that (i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;…(iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not; (3) Failure to state a material fact if the failure deceives or tends to deceive;… Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (i) The promotion or sale of any consumer goods, consumer realty, or consumer service;"

Md. Code Ann. Com. Law § 13-301(1), 2(i), (2)(iv), (3), (9)(i) (*cf.* Model Form 3; CLRA)

**Massachusetts**:

Similar to California's UCL and Model Form 1, Maine law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…."

Mass. Gen. Laws Ann., Ch. 93A, §§ 2 (*cf*. Model Form 1; UCL)

**Michigan**:

Similar to California's UCL and Model Form 1, Michigan law prohibits "unfair, unconscionable, or deceptive methods, acts or practice in the conduct of trade or commerce[.]"

Mich. Comp. Laws Ann. §§ 445.903 (3)(1) (*cf*. Model Form 1; UCL)

**Minnesota**:

Similar to California's UCL and Model Form 2, Minnesota law prohibits "the act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice[.]"

Minn. Stat. §§ 325F.69; subd. 1 (*cf*. Model Form 2, UCL)

And similar to California's CLRA and Model form 3, Minnesota law also prohibits familiarly enumerated deceptive trade practices:  "A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person: . . . (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; . . . (7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; . . . [or] (9) advertises goods or services with intent not to sell them as advertised[.]"

Minn. Stat. 325D.44, subd. 1 (*cf*. Model Form 3; CLRA)

**Mississippi**:

Similar to California's UCL and Model Form 1, Mississippi law prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce."

Miss. Code Ann. § 75-24-5(1) (*cf*. Model Form 1; UCL)

And similar to California's CLRA and Model Form 3, Mississippi law also prohibits familiarly enumerated deceptive trade practices:  (e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;… (g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular

style or model, if they are of another;… (i) Advertising goods or services with intent not to sell them as advertised…"

Miss. Code Ann. § 75-24-5(2)(e), (g), (i) (*cf*. Model Form 3; CLRA)

**Missouri**:

Similar to California's UCL and Model Forms 1 and 2, Missouri law prohibits "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce[.]"

Vernon's Ann. Mo. Stats.§ 407.020 (*cf*. Model Forms 1 and 2; UCL)

**Montana**:

Similar to California's UCL and Model Form 1, Montana law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Mont. Code. Ann. § 30-14-103 (*cf*. Model Form 1; UCL)

**Nebraska**:

Similar to California's UCL and Model Form 1, Nebraska law prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"

Neb. Rev. Stat. Ann § 59-1602 (*cf*. Model Form 1; UCL)

**Nevada**:

Similar to California's CLRA and Model Form 3, Nevada law prohibits a person from engaging in the familiarly enumerated deceptive trade practices that include, "5. Knowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith... 7. Represent[ing] that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model… 9. Advertis[ing] goods or services with intent not to sell or lease them as advertised…"

Nev. Rev. Stat. §§ 598.0903 through 598.0999; Nev. Rev. Stat. § 41.600 (*cf*. Model Form 3; CLRA)

**CLASS ACTION AMENDED COMPLAINT**

**New Hampshire**:

Similar to California's UCL and Model Form 1, New Hampshire law prohibits "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce[.]"

N.H. Rev. Stat. Ann. §§ 358-A:2 (*cf.* Model Form 1; UCL)

**New Jersey**:

Similar to California's UCL and Model Form 2, New Jersey law prohibits "the act, use or employment by any person of unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation… in connection with the sale or advertisement of any merchandise[.]"

N.J. Stat. Ann. § 56:8-2 (*cf.* Model Form 2; UCL)

**New Mexico**:

Similar to California's UCL and Model Form 1, New Mexico law prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce."

N.M. Stat. Ann. § 57-12-3 (*cf.* Model Form 1; UCL)

And similar to California's CLRA and Model Form 3, New Mexico defines these practices as: "…(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that the person does not have;… (7) representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model if they are of another; (14) using exaggeration, innuendo or ambiguity as to a material fact or failing to state a material fact if doing so deceives or tends to deceive…"

N.M. Stat. Ann. § 57-12-2(D)(5), (7), (14) (*cf.* Model Form 3; CLRA)

**New York**:

Similar to California's UCL and Model Forms 1 and 2, New York law prohibits "deceptive acts or practices in the conduct of any business, trade or commerce[.]"

N.Y. Gen. Bus. Law § 349(a) (*cf.* Model Forms 1 and 2)

**North Carolina**:

Similar to California's UCL and Model From 1, North Carolina law prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

N.C. Gen. Stat. §§ 75-1 *et seq.* (*cf.* Model Form 1; UCL)

**CLASS ACTION AMENDED COMPLAINT**

**North Dakota**:

Similar to California's UCL and Model Form 2, North Dakota law prohibits "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation[.]"

N.D.C.C. §51-15-02 (*cf.* Model Form 2; UCL)

**Ohio**:

Similar to California's CLRA and Model form 3, Ohio law also prohibits familiarly enumerated deceptive trade practices:  "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction.  . . . [T]he act or practice of a supplier in representing any of the following is deceptive:  (1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; [or] (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not[.]"

Ohio Rev. Code § 1345.02 (*cf.* Model Form 3; CLRA)

**Oklahoma**:

Similar to California's CLRA and Model Form 3, Oklahoma law prohibits a person from engaging in the following familiarly enumerated deceptive trade practices: "…(2) Mak[ing] a false or misleading representation, knowingly or with reason to know, as to the source, sponsorship, approval, or certification of the subject of a consumer transaction; (3) Making a false or misleading representation, knowingly or with reason to know, as to affiliation, connection, association with, or certification by another;… Mak[ing] a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith;…"

Okla. Stat. Ann. tit. 15, § 753(2), (3), (5), tit. 78, § 53 (*cf.* Model Form 3; CLRA)

Also, as with California's UCL and Model Form 1, it is a violation of Oklahoma law to "[c]omit[] an unfair or deceptive trade practice."

Okla. Stat. Ann. tit. 15 § 752(20). (*cf.* Model Form 1; UCL)

**Oregon**:

Similar to California's CLRA and Model Form 3, Oregon law prohibits a person from engaging in the following familiarly enumerated deceptive trade practices:  "…(e) Represent[ing] that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have…. (g) Represents that real estate, goods or services are of a particular standard, quality, or grade, or that real estate or goods are of a particular style or model, if the real estate, goods or

services are of another…. (t) Concurrent with tender or delivery of any real estate, goods or services fails to disclose any known material defect or material nonconformity.

Or. Rev. Stat. § 646.608(1)(e), (g), (t); § 646.608(2) (*cf.* Model Form 3; CLRA)

Also, as with California's UCL and Model Form 1, it is a violation of Oregon law when a person "[e]ngages in any other unfair or deceptive conduct in trade or commerce[.]"

Or. Rev. Stat. § 646.608(1)(u). (*cf.* Model Form 1; UCL)

**Pennsylvania**:

Similar to California's UCL and to Model Form 1, Pennsylvania law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"

73 Pa. Stat. Ann. § 201-3 (*cf.* UCL; Model Form 1).

And similar to California's CLRA and Model Form 3, Pennsylvania defines these practices as "(ii) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services…(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;… (vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;... (xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

73 Pa. Stat. Ann. § 201-2(4)(ii); (v); (vii); (xxi) (*cf.* Model Form 3; CLRA)

**Rhode Island**:

Similar to California's UCL and to Model Form 1, Rhode Island law prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]"

R.I. Gen. Laws Ann. § 6-13.1-2.

And similar to California's CLRA, Rhode Island adopts Model Form 3 to define these practices as "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; . . . (vii) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; . . . [or] (ix) Advertising goods or services with intent not to sell them as advertised.

R.I. Gen. Laws § 6-13.1-1 (*cf.* Model Form 3; CLRA)

**South Carolina**:

Similar to California's UCL and to Model Form 1, South Carolina prohibits: "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

S.C. Code § 39-5-20(a) (*cf.* UCL; Model Form 1)

**South Dakota**:

Similar to California's UCL and to Model Form 2, South Dakota declares it "a deceptive act or practice for any person to: (1) Knowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby…"

S. D. Codified Laws § 37-24-6(1) (*cf.* UCL; Model Form 2)

**Tennessee:**

Similar to California's UCL and to Model Form 1, Tennessee law declares unlawful "unfair or deceptive acts or practices affecting the conduct of any trade or commerce."

Tenn. Code §§ 47-18-104(a) (*cf.* UCL; Model Form 1).

Also similar to California's CLRA and Model Form 3, Tennessee law defines such conduct as: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;… (7) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;… ;… (9) Advertising goods or services with intent not to sell them as advertised… (21) Using statements or illustrations in any advertisement which create a false impression of the grade, quality, quantity, make, value, age, size, color, usability or origin of the goods or services offered, or which may otherwise misrepresent the goods or services in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised goods or services to other goods or services;… (27) Engaging in any other act or practice which is deceptive to the consumer or to any other person; provided, however, that enforcement of this subdivision (b)(27) is vested exclusively in the office of the attorney general and reporter and the director of the division."

Tenn. Code §§ 47-18-104(b)(5), (b)(7), (b)(9), (b)(21), (b)(27) (*cf.* Model Form 3; CLRA)

**Texas**:

Similar to California's CLRA and Model Form 3, Texas law declares unlawful the following "false, misleading, or deceptive acts or practices[:]… (2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (3) causing confusion or misunderstanding as to affiliation, connection, or

**CLASS ACTION AMENDED COMPLAINT**

association with, or certification by, another;… (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not… (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;… (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."

Tex. Bus. & Com. Code §17.46(b)(2), (b)(3), (b)(5), (b)(7), (b)(24) (*cf.* Model Form 3; CLRA)

**Utah**:

Similar to California's CLRA and Model Form 3, Utah law prohibits "a deceptive act or practice by a supplier in connection with a consumer transaction" which includes where a supplier: "(a) indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not; (b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not;… (e) indicates that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not;… (i) indicates that the supplier has a sponsorship, approval, or affiliation the supplier does not have…"

Utah Code §13-11-4(1), (4)(2)(a), (4)(2)(b), (4)(2)(e), (4)(2)(i) (*cf.* Model Form 3; CLRA)

**Vermont**:

Similar to California's UCL and Model Form 1, Vermont law prohibits "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce [.]"

Vt. Stat. Ann. tit. 9, § 2453 (*cf.* Model Form 1; UCL)

**Virginia**:

Similar to California's UCL and Model Form 2, Virginia law prohibits "any promise, assertion, representation or statement of fact which is untrue, deceptive or misleading, or uses any other method, device or practice which is fraudulent, deceptive or misleading to induce the public to enter into any obligation."

Va. Code §59.1-683 (*cf.* Model Form 2; UCL)

Similar to California's CLRA and Model Form 3, Virginia law also prohibits familiarly enumerated deceptive trade practices: "A. The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful: 5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; 6. Misrepresenting that goods

or services are of a particular standard, quality, grade, style, or model; [or] 8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised[.]"

Va. Code §59.1-200 (*cf*. Model Form 3; CLRA)

**Washington**:

Similar to California's UCL and Model Form 1, Washington law prohibits "[u] nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce [.]"

Wash. Rev. Code § 19.86.020 (*cf*. Model Form 1; UCL)

**West Virginia**:

Similar to California's UCL and Model Form 1, West Virginia law also prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

W.Va. Code § 46A-6-104 (*cf*. Model Form 1; UCL)

And similar to California's CLRA and Model Form 3, West Virginia defines "unfair methods of competition and unfair or deceptive acts or practices" as "(E) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have; . . . (G) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another; . . . [or] (I) Advertising goods or services with intent not to sell them as advertised[.]" *Id.* at § 46A-6-102(7).

W.Va. Code § 46A-6-102(7) (*cf*. Model Form 3; CLRA)

**Wisconsin**:

Similar to California's UCL and Model Form 2, Wisconsin prohibits representations or statements of fact "which is untrue, deceptive, or misleading."

Wisc. Stat. § 100.18(1) (*cf*. Model Form 2; UCL)

**Wyoming**:

Similar to California's UCL and Model Form 1, Wyoming law prohibits an individual from "(xv) Engag[ing] in unfair or deceptive acts or practices."

Wyo. Stat. § 40-12-105(a)(xv). (*cf*. Model Form 1; UCL)

And similar to California's CLRA and Model Form 3, Wyoming law enumerates certain deceptive trade practices to include when a person knowingly: "(i) Represents that merchandise has a source, origin, sponsorship, approval, accessories or uses it does not have; (ii) Represents that he has a sponsorship, approval or affiliation he does

not have; (iii) Represents that merchandise is of a particular standard, grade, style or model, if it is not."

Wyo. Stat. § 40-12-105(a)(i), (ii), (iii) (*cf.* Model Form 3; CLRA).

The same conduct described herein, which violates the Model acts and California's UCL and CLRA, concomitantly violates these consumer protection statutes.  Defendants engaged in unfair competition and deceptive practices by not providing what was promised or what was necessarily and reasonably implied: a fair application process that applied the same criteria for admission for all applicants.

533.    Each of the representations by the University Defendants on their respective websites as to the integrity of the admissions process was material, and most reasonable student applicants and their parents would attach importance to the existence or non-existence of the integrity of the admissions process.  It would have been material for each member to the Class, when deciding whether to apply to the university and pay the application fee, to know whether students were being admitted through "side door" bribery schemes, and all members of the Class would deem it important to know of such bribery schemes.  Each of the named Class representatives, and each Member of the Class, reasonably and justifiably relied upon the integrity of the admissions process as represented by the Universities.  With respect to the named Plaintiffs, the failure to advise them of the bribery scheme and the misrepresentation of the admissions process as merit-based were substantial factors influencing their decisions to apply to those universities and pay application fees.

534.    Defendants' violations caused damage to members of the class and threaten additional injury if the violations continue. This damage includes the loss of monies paid by class members for application fees and forwarding standardized test scores.

535.    The unfair and deceptive business practices set forth have and continue to injure class members and the general public and cause the loss of money.  These violations have unjustly enriched Defendants at the expense of class members. As a result, class members are entitled to monetary relief and any equitable relief the Court deems proper.

**COUNT XI**

**University Defendants, The Key and KWF**

**Public Injunction for Violation of California's UCL**

536.     Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

537.     California Business & Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Defendants violated, and continue to violate, California's Unfair Competition Law, California Business Professions Code § 17200 *et seq*., by engaging in the above-described unlawful, unfair, fraudulent, deceptive, untrue, and misleading acts and practices.

538.     The University Defendants committed unlawful and unfair acts and practices by representing on its websites that its college admission process would be based on the applicant's test scores, academic grades, activities, and other categories of merit as opposed to the bribe money that could be paid to the University Defendants and its officials. The University Defendants failed to clearly and adequately disclose that bribe money and other forms of corruption affected an applicant's college admission process. The Key and KWF committed unlawful and unfair acts and practices by bribing and conspiring with the employees of the University Defendants to improperly secure admission into highly selective universities for students whose parents paid bribery payments.

539.     The University Defendants knew or should have known of these corrupt business practices since the bribe money was at times deposited into University accounts, and to the accounts of prominent University officials such as coaches and directors in charge of the University accounts. The Key and KWF knew or reasonably should have known that its business practices of bribing employees to secure admission slots for students were unlawful and unfair practices since it disguised the bribery payments as "charitable" donations to avoid discovery of its unlawful practices.

540.     The University Defendants representation of a merit based admission application process, while ignoring the widespread bribery occurring within its admission application process, constitutes "unlawful" and "unfair" business acts and practices in violation of the UCL.  Moreover, the failure of these University Defendants to audit and provide other quality control mechanisms to ensure that its admission process is not improperly tainted, in itself, constitutes an unfair business

1  practice. The Key and KWF facilitation of bribing the employees of the universities to secure
2  admission for students constitutes "unlawful" and "unfair" business acts and practices in violation of
3  the UCL.

4       541.    Further, the Plaintiffs and members of the public who applied to the University
5  Defendants reasonably believing that they would receive fair consideration and a merit-based
6  application process as compared to all other applicants.  The University Defendants failure to provide
7  the fair merit-based application process caused harm to Plaintiffs and the general public. The harm
8  caused by Defendants' wrongful conduct substantially injured all individuals, including Plaintiffs,
9  who applied for undergraduate admission. Plaintiffs and the individual applicants could not have
10  reasonably avoided injury because only the University Defendants, its employees, The Key and KWF
11  knew or had reason to know that the admission application process was and could be influenced with
12  bribe money.

13       542.    Plaintiffs and the general public, including the individual applicant's and their parents,
14  are entitled to a public injunction, under California Business and Professions Code § 17203, 17204,
15  to stop the University Defendants, The Key and KWF wrongful acts and to require the University
16  Defendants to maintain adequate college admission process to ensure that the process is based on
17  merit and not tainted by bribes or any other illegal act.

18       543.    An admission application process that fails to be merit based or can be influenced by
19  bribery or other inappropriate methods is harmful to Plaintiffs and the general public. These violations
20  have unfairly enriched the University Defendants, The Key and KWF at the expense of Plaintiffs and
21  the general public. As a result, Plaintiffs and the general public are entitled to injunctive relief,
22  restitution, and other equitable relief. Plaintiffs also seek an award of attorney's fees and costs allowed
23  by Cal. Code. Civ. P. § 1021.5.

**PRAYER FOR RELIEF**

25       WHEREFORE, Plaintiffs, individually and on behalf of all other class members,
26  respectfully request that the Court enter an Order:

27       a.    Declaring that this action is a proper class action, certifying the Classes, designating
28  Plaintiffs as Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

b.      Enjoining Defendants from continuing the unfair business practices alleged in this Complaint;

c.      Ordering Defendants to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other class members, as allowable by law;

d.      Granting monetary damages and injunctive relief under California's Consumers Legal Remedies Act.

e.      Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

f.      Ordering Defendants to pay attorneys' fees and costs of suit; and

g.      Ordering such other and further relief as may be just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: August 16, 2019                    **ZIMMERMAN REED LLP**

s/ Alia M. Abdi
David M. Cialkowski (*pro hac vice*)
Brian C. Gudmundson*
Alia M. Abdi (*pro hac vice*)
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
david.cialkowski@zimmreed.com
brian.gudmundson@zimmreed.com
alia.abdi@zimmreed.com

Caleb Marker (SBN 269721)
**ZIMMERMAN REED LLP**
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
Telephone: (877) 500-8780
Facsimile: (877) 500-8781
caleb.marker@zimmreed.com

**CLASS ACTION AMENDED COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John F. Medler, Jr. (SBN 266474)
**THE MEDLER LAW FIRM, APC**
2030 Main Street Suite 1300
Irvine, CA 92614
Telephone: (949) 260-4940
Facsimile: (949) 260-4944
john@medlerlawfirm.com

Daniel E. Gustafson
Raina C. Borrelli
Mickey L. Stevens
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dgustafson@gustafsongluek.com
rborrelli@gustafsongluek.com
mstevens@gustafsongluek.com

Simon B. Paris
Patrick Howard
Charles J. Kocher
**SALTZ, MONGELUZZI, BARRETT
& BENDESKY, P.C.**
1650 Market Street, 52nd Floor
Philadelphia, PA  19103
Telephone: (215) 496-8282
sparis@smbb.com
phoward@smbb.com
ckocher@smbb.com

*Attorneys for Plaintiffs and the Class*

*\* subject to admission pro hac vice*

**CLASS ACTION AMENDED COMPLAINT**

1

## **<u>DECLARATION</u>**

2

The undersigned counsel affirms and declares, under *Cal. Civ. Code Sec. 1780(d),* that venue

3

in this County and District is appropriate under the provisions of the CLRA.

4

<u>s/ Alia M. Abdi</u>

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLASS ACTION AMENDED COMPLAINT**